# Howse & Associates

### PRIVATE INVESTIGATIONS & PUBLIC SAFETY CONSULTING

99 Trophy Club Drive                                        (817) 988-8443
Trophy Club, Texas 76262                                    (817) 488-4901 (Fax)

December 22, 2021

Mr. Randall L. Kallinen
Kallinen Law, PLLC
511 Broadway Street
Houston, Texas 77012

RE: Stephen Bryant Case

Dear Mr. Kallinen:

Enclosed is my preliminary report in the matter involving Mr. Stephen Bryant which is
currently in the United States District Court for the Southern District of Texas.  I have
also enclosed my current CV and a case history which is incorporated into the report.
Please let me know if you have any questions.  I will update the report as necessary.

Respectfully,

/s/ *Keith A. Howse*

Keith A. Howse

**Preliminary Report in the Matter of**

**Civil Action No. 3:20-cv-00374**

**United States District Court for the Southern District of Texas**

The opinions released in this report are based upon a review of the facts, as thus far presented, along with the sources listed below, concerning the incident involving Mr. Stephen Bryant and Deputy James (Zach) Holley, Deputy Martin Silvas and the Galveston County Sheriff's Office (GCSO). In reaching my opinions, I have relied upon 47 years of professional experience in the fields of public safety and law enforcement. My professional opinions expressed within this report are based upon a reasonable degree of certainty with regard to law enforcement professional standards, practices, training and conduct.

I have also relied upon seven years of undergraduate and graduate level academic studies in the fields of police science, criminal justice, criminology and law as well as my professional experience and certifications as a Master Peace Officer, Police Instructor and law enforcement executive. Attached and incorporated is a copy of my CV which further outlines my education, training and experience and attests to my qualifications to evaluate and express my opinion on the circumstances surrounding the above matter.

I have reviewed GCSO incident reports, GCSO internal affairs/professional standards reports, including witness and deputy statements and in-car video related to the incident under review, which are items that are commonly and routinely inspected and reviewed as part of a law enforcement procedure or use of force investigation. These sources are more specifically described below.

## SOURCES & DOCUMENTATION

The following sources and documentation were supplied, reviewed and/or analyzed during the preparation of this report:

- ❑ Plaintiff's Original Complaint;
- ❑ GCSO Incident and Booking Reports;
- ❑ GCSO Internal Affairs/Office of Professional Standards Case Report;
- ❑ Deposition of Corporal James Zach Holley;
- ❑ Relevant GCSO Policies;
- ❑ Texas Penal Code;
- ❑ Texas Code of Criminal Procedure;
- ❑ Texas Local Government Code;
- ❑ Texas Constitution;

❑   United States Constitution;
❑   Texas Commission on Law Enforcement-Use of Force Lesson Plan-
     Intermediate Course;
❑   Law Enforcement Code of Ethics.

### *INCIDENT SUMMARY*

On or about December 14, 2018, at approximately 10:00pm, Galveston County Sheriff's Deputies James Holley and Martin Silvas responded to a domestic disturbance call at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Upon arrival the deputies met with Kristen Bryant, spouse of Stephen Bryant, outside her home. Ms. Bryant told deputies that Mr. Stephen Bryant had assaulted her by using a laptop computer to push her onto a bed. Upon seeing the deputies, Mr. Bryant, who was also outside, retreated into his home. The deputies then pursued Mr. Bryant and subsequently made forced entry into the home and arrested him for evading arrest and assault.

Mr. Bryant was then handcuffed and placed in the rear seat of the deputies' patrol vehicle. After the deputies completed their investigation, they began driving away from the scene, with Mr. Bryant in their custody, heading to the City of Santa Fe Jail. Shortly after pulling away from the scene, Mr. Bryant reported that Deputy Holley ordered Deputy Silvas to stop the vehicle. After Deputy Silvas did so, Deputy Holley exited the front passenger seat and opened the back passenger side door and physically got on top of Mr. Bryant yelling at him and briefly choking Mr. Bryant about the neck. Deputy Holley's actions were apparently due to Mr. Bryant cursing and yelling at the deputies from the back seat.

Mr. Bryant was subsequently booked into jail.  On 12/20/2018 Mr. Bryant filed a formal complaint with the GCSO concerning Deputy Holley's conduct.[1] GCSO Internal Affairs/Office of Professional Standards investigator, Lieutenant B.W. Balchunas, investigated the complaint and prepared a report on 03/08/2019.

The findings from this report show that Deputy Holley was investigated on four allegations of violations of GCSO policies including, Use of Force (Reporting); Use of Force (Excessive); Use of Force (Unnecessary); and Conduct Towards Public. The findings of the investigation show Deputy Holley was found to have violated (Sustained) Use of Force (Reporting); Use of Force (Unnecessary) and Conduct Toward Public GCSO policies. On the allegation of Use of Force (Excessive), Deputy Holley was cleared with a finding of Not Sustained.

Deputy Silvas was investigated on two allegations of violations of GCSO policies including, Accountability and Responsibility and Use of Force (Reporting). The findings of the investigation show Deputy Silvas was found to have violated (Sustained) both GCSO policies.

---

[1] Date originally reported to GCSO Deputy Susan Hernandez and Lieutenant B.W. Balchunas. Formal Citizen Complaint Package received by GCSO on 12/21/2018.

## *SCOPE OF REVIEW*

The scope and nature of this report is to provide an independent evaluation of the conduct of Deputy James Holley and Deputy Martin Silvas and the Galveston County Sheriff's Office to determine whether their use of force against Mr. Stephen Bryant was consistent with professional standards and generally accepted practices of the law enforcement profession. The report is intended to assist the trier of fact with knowledge regarding police training, practices, policies and procedures.

## *GENERAL ANALYSES & OPINIONS*

Prior to analyzing any use of force by a peace officer it is important to understand the realm in which peace officers operate. Texas peace officers, indeed all peace officers, are trained in the use of force and the use of deadly force while in the police academy and again throughout their careers during continuing education training. Peace officers are trained that any use of force or deadly force must be reasonable for the circumstances and immediately necessary.

Peace officers are trained that their use of force or deadly force will be evaluated and reviewed based upon their agency's use of force policy and any applicable legal standards. Peace officers are trained that their use of force or deadly force will be evaluated on an objectively reasonable basis from the position of a similarly trained and situated peace officer and based on information that was known to the officer at the time.[2]

Officers are trained on the Texas Constitution and the United States Constitution, with particular emphasis on the Fourth Amendment of the US Constitution which is stated below.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [3]

Peace officers also swear an oath prior to performing official peace officer actions.

> I, (name of officer), do solemnly swear (or affirm), that I will faithfully execute the duties of the office of (name of office, i.e. peace officer) of the State of

---

[2] Graham v. Connor , 490 U.S. 386 (1989) as discussed in Texas Commission on Law Enforcement (TCOLE) Use of Force Training Courses.
[3] U.S. Const., amend. IV.

Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God.[4]

A Texas Sheriff must also execute a surety bond that may be sued upon from time to time for violations of the oath.[5] Because the Sheriff is also responsible for the actions of his deputies, the Sheriff may also require that a surety bond is filed for each deputy for which the Sheriff, or any citizen, may sue upon from time to time for violations of the deputy's oath.[6]

The law enforcement profession has also adopted a Code of Conduct known as the Law Enforcement Code of Ethics to further guide peace officers in their duties.

Law Enforcement Code of Ethics

As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality, and justice.

I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

---

[4] Texas Constitution, Article XVI, Section 1.
[5] Texas Local Government Code-Section 85.001-Oath and Bond.
[6] Texas Local Government Code-Section 85.003-Deputies.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession… law enforcement.[7]

## ANALYSIS OF THE USE OF FORCE AGAINST MR. STEPHEN BRYANT

Video Analytics:

In this case neither Deputy Holley nor Deputy Silvas were equipped with a body camera. There is an in-car camera video (front dash view) that captures partial audio and video of the scene. The patrol vehicle was also equipped with an in-car rear seat video camera that would have captured the interaction between Deputy Holley and Mr. Bryant. However, this camera was never activated by either deputy.  The Texas Commission on Law Enforcement Model Policy on Mobile Audio/Video Recording Systems states the following:

Officers assigned to patrol vehicles equipped with audio/video recorder systems shall activate their audio and video recording systems when responding to and under the following conditions:

All enforcement and investigative contacts to include traffic and pedestrian stops and field interviews.

All criminal investigations.

Anytime an officer is in contact with a citizen or suspect when it is feasible that the video system may record all or part of the contact.

Anytime the officer's emergency lighting is activated while responding to a call for service.

Any officer involved in a fleet collision shall, unless physically unable to, immediately activate their video and audio recording system.

Any other contact that becomes adversarial after the initial contact in a situation that would not otherwise require recording.

According to GCSO Lieutenant Balchunas, Deputy Holley reported in his statement to GCSO Office of Professional Standards that he did not activate the rear seat camera because it was considered to be optional by GCSO when transporting prisoners who were

---

[7] Law Enforcement Code of Ethics as adopted by the International Association of Chiefs of Police, October 1957. The Law Enforcement Code of Ethics has also been adopted by the Texas Commission on Law Enforcement.

in custody. Failing to require recording of the back seat of a patrol vehicle, which is primarily used for the custody of prisoners, creates a safe space where prisoner abuse can go undetected.

Based upon my professional training and experience, it is my opinion that the conduct of Deputy Holley, in not activating his rear seat camera, was outside the scope of generally accepted police practices and procedures. Likewise, Deputy Silvas could also have activated the rear seat camera, and, because he did not, his conduct was also outside the scope of generally accepted police practices and procedures.

As of this writing the GCSO video recording policy has not yet been submitted for review. If the facts are that the GCSO policy and procedure is to allow the recording of rear seat prisoners to be optional, then it is also my opinion that such conduct by the GCSO is also outside the scope of generally accepted police procedures and practices. Although police body cameras are a fairly recent addition to standard police equipment, in-car video systems have been used by law enforcement agencies for several decades.

Victim/Witness Statements:

According to Lieutenant Balchunas' investigative report, he obtained victim and witness statements from Mr. Bryant and Ms. Bryant, respectively. Mr. Bryant stated in his complaint affidavit that he was handcuffed and sitting in the rear seat of the GCSO patrol vehicle. Shortly after Deputy Silvas drove away from the scene, Mr. Bryant reported that Deputy Holley ordered Deputy Silvas to stop the vehicle. After Deputy Silvas did so, Deputy Holley exited the front passenger seat and opened the back passenger side door and physically got on top of Mr. Bryant yelling at him to shut his mouth and choking Mr. Bryant about the neck. Deputy Holley then returned to the front seat and they continued on to the City of Santa Fe Jail. While in transit, Mr. Bryant told Deputy Holley that he had just committed a felony crime because he impeded Mr. Bryant's ability to breathe. Deputy Holley then laughed and responded that it was actually only a misdemeanor. Mr. Bryant also stated that he thought Deputy Holley "messed" with the back seat camera before the incident.[8]

According to Lieutenant Balchunas, Ms. Bryant told him that she observed the GCSO patrol vehicle leave from in front of their home and then stop thirty feet away where she observed a deputy, later identified as Deputy Holley, exit the front seat and abruptly jump into the back seat of the patrol vehicle head first where some sort of "tussle" or "struggle" occurred. Ms. Bryant reported hearing loud yelling that was not Mr. Bryant's voice. Ms. Bryant estimated the altercation lasted for about 40 seconds to close to a minute before the Deputy then left the back seat and returned to the front seat.[9]

Officer Statements:

---

[8] IA/PSD Case Report #201900003prepared by Galveston County Sheriff's Office, pages 1-2.
[9] IA/PSD Case Report #201900003prepared by Galveston County Sheriff's Office, pages 7-11.

Lieutenant Balchunas obtained a statement from Deputy Martin Silvas who was driving the patrol vehicle. According to Lieutenant Balchunas' report, Deputy Silvas stated Deputy Holley told him to stop the vehicle, which Deputy Silvas did. Deputy Silvas believes this was due to Mr. Bryant yelling and cursing at the deputies from the back seat. Lieutenant Balchunas asked Deputy Silvas if Mr. Bryant had become physically violent such as kicking out the windows or banging his head against the prisoner cage. Deputy Silvas clarified that Mr. Bryant was not and that he was "just yelling". Deputy Holley then got out of the vehicle and opened the back door and was yelling at Mr. Bryant to calm down. Deputy Silva estimated the incident was less than a minute in duration. When Deputy Holley returned to the front seat he advised Deputy Silvas that Mr. Bryant tried to get out of the vehicle and had kicked the Deputy. Lieutenant Balchunas asked Deputy Silvas if he observed Deputy Holley's actions while in the back seat. Deputy Silvas reported that he did not see anything and that he was in the front seat facing forward the entire time. Deputy Silvas advised that he never saw Deputy Holley on top of Mr. Bryant or make any attempt to choke Mr. Bryant. Deputy Silvas also stated that he never exited the patrol vehicle.

Deputy Silvas also reported in the offense report that Mr. Bryant was arrested and transported without incident. Lieutenant Balchunas asked Deputy Silvas if this was true. Deputy Silvas responded that is was not. Deputy Silvas was asked if he attempted to intervene in the incident to which Deputy Silvas clarified that he did not. Lieutenant Balchunas asked Deputy Silvas if he reported the incident to a GCSO supervisor, or filed a use of force report, to which he responded he had not.[10]

Lieutenant Balchunas also obtained a statement from Deputy Holley regarding the incident.  In his report he states Deputy Holley recalled that Mr. Bryant was in the back seat "kicking around" and screaming "at the top of his lungs". Deputy Holley advised Deputy Silvas to stop the vehicle. Deputy Holley got out of the vehicle and opened the rear passenger door to tell Mr. Bryant to calm down. Deputy Holley then observed Mr. Bryant attempt to exit the vehicle by putting his legs outside the vehicle while Deputy Holly was talking to him. Deputy Holley then pushed Mr. Bryant's legs back into the patrol vehicle.  Deputy Holley estimated the incident took 10-20 seconds, then he returned to the front seat and they continued their journey to jail.

Lieutenant Balchanus asked Deputy Holley if he activated the rear camera due to Mr. Bryant's conduct. Deputy Holley said he did not but in retrospect probably should have. Deputy Holley was also asked if he thought it was a good idea to open the door and talk face to face with someone who is being belligerent. Deputy Holley clarified that Mr. Bryant never threatened to harm the deputies, or anyone else, and was just being vulgar toward the deputies.

Lieutenant Balchunas asked Deputy Holley if he attempted to de-escalate the matter prior to opening the back door and confronting Mr. Bryant. Deputy Holley clarified he did not because Mr. Bryant was seated directly behind him in the patrol vehicle. Lieutenant

---

[10] IA/PSD Case Report #201900003prepared by Galveston County Sheriff's Office, pages 14-20.

Balchunas asked Deputy Holley if he could have just continued driving to the jail instead of having a face to face confrontation with Mr. Bryant. Deputy Holley agreed that they should have probably just kept driving.

Lieutenant Balchunas asked Deputy Holley if he ever choked Mr. Bryant. Deputy Holley responded, "Absolutely not, absolutely not." Deputy Holley further stated that he did not recall putting his hand around Mr. Bryant's neck. Deputy Holley was also asked if it was possible that during the struggle with Mr. Bryant that his hands could have contacted Mr. Bryant's neck.  Deputy Holley clarified that it was possible. Deputy Holley also denied ever getting on top of Mr. Bryant. Deputy Holley only recalls telling Mr. Bryant to shut his mouth. Deputy Holley did recall Mr. Bryant accusing him of committing a felony, however he does not recall ever saying to Mr. Bryant that his actions were only a misdemeanor. Deputy Holley also confirmed he did not write a Use of Force report on the incident but did verbally notify GCSO Sergeant Ostermayer of the incident after booking Mr. Bryant in the Santa Fe Jail.[11]


General Discussion of Officer Conduct

Deputy Holley:

Based upon the investigative findings of the Galveston County Sheriff's Office, Deputy Holley engaged in inappropriate conduct with Mr. Bryant when he ordered Deputy Silvas to stop the patrol vehicle so he could open the back door and confront Mr. Bryant regarding his cursing at the deputies. GCSO Policy Standards of Conduct, GC. 03.04 states in part:

> E. Conduct Toward the Public:
>
> 1.      Employees shall conduct themselves toward the public in a civil and professional manner supporting a service orientation and fostering public respect and cooperation.
>
> 2.      Employees shall treat violators with respect and courtesy, guard against employing an officious or overbearing attitude, or language that may belittle, ridicule, or intimidate the individual, or act in a manner that unnecessarily delays the performance of their duty.
>
> 3.      While recognizing the need to demonstrate authority and control over criminal suspects and prisoners, officers shall adhere to this agency's use of force policy and shall observe the civil rights and protect the well-being of those in their charge.

It is important to note that peace officers are trained to remain calm and not let the actions of others cause them to lose their temper. It is expected that citizens may, from

---

[11] IA/PSD Case Report #201900003prepared by Galveston County Sheriff's Office, pages 20-30.

time to time, test an officer's patience. Police officers in Texas also receive training in the verbal art of de-escalation when dealing with citizen encounters. Based upon my professional training and experience it does not appear that Deputy Holley attempted to employ any tactical de-escalation measures prior to confronting Mr. Bryant.

Peace officers are also trained to follow and obey Department policies and procedures. Based upon the information submitted thus far, I agree with the findings of the GCSO that Deputy Holley's actions violated the policy regarding conduct toward the pubic and that such actions are also outside the scope of generally accepted police practices and procedures.

Based upon the investigative findings of the Galveston County Sheriff's Office, Deputy Holley engaged in unnecessary force against Mr. Bryant when he opened the back door of the patrol vehicle and then engaged in a physical confrontation with Mr. Bryant. Deputy Holley admitted Mr. Bryant never threatened any harm to the deputies and was just being belligerent. The GCSO Use of Force Policy, GC.201 states in part:

> D. Use of Non-Deadly Force
> 1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.

Additional guidance in this matter is provided by Sir Robert Peel's Sixth Principle of Policing.

> Police use physical force to the extent necessary to secure observance of the law or to restore order only when the exercise of persuasion, advice and warning is found to be insufficient. [12]

Based upon my professional training and experience, it is clear that Deputy Holley became frustrated by Mr. Bryant's verbal actions. I agree with the GCSO findings that Deputy Holley's use of force against Mr. Bryant was unnecessary as Mr. Bryant never threatened to harm any deputies, or anyone else, as he sat handcuffed in the back seat of the patrol vehicle.  It is also my opinion that a reasonable, trained and similarly situated peace officer would not have engaged in such unnecessary force on a citizen and that peace officers are trained to follow their Department's policies and procedures.

In addition, Deputy Holley's actions were also inconsistent with the Law Enforcement Code of Ethics which states in part:

> I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

---

[12] Sir Robert Peel founded the Metropolitan London Police and adopted nine principles that have come to be known as Peel's Nine Principles of Policing and he is often cited as the father of modern policing.

Deputy Holley's actions of unnecessary force were also inconsistent with the Oath of Office taken by Texas peace officers to protect and defend the US Constitution which includes Fourth Amendment protections. Peace officers are trained to abide by their Oath of Office. A reasonable, trained and similarly situated peace officer would understand that his training on use of force would prohibit unnecessary force. For these reasons it is also my opinion that Deputy Holley's actions were not objectively reasonable for the circumstances and that his use of unnecessary force against Mr. Bryant was also outside the scope of generally accepted police practices and procedures.

Based upon the investigative findings of the Galveston County Sheriff's Office, Deputy Holley also failed to file a written report documenting his use of force against Mr. Bryant. While Deputy Holley noted that he did recall verbally notifying GCSO Sergeant Ostermayer of the incident, Deputy Holley did not file a use of force report. GCSO policy Reporting Use of Force, GC 202, states in part:

> 202.4 Procedures
>
> A. Responsibility for Reporting
> 1. Officers shall make immediate verbal report to their supervisors following any reportable use of force and file a written incident report.
> a. Each officer who uses force in an incident shall submit a separate written use of force report.

Based upon my professional training and experience I agree with GCSO investigative findings that Deputy Holley failed to properly document and submit a written use of force report. It is also my opinion that Texas peace officers are trained to be truthful in their reporting and that a reasonable, trained and similarly situated peace officer would not have failed to report the use of force on a citizen.  Peace officers are trained to follow their Department's policies and procedures and Deputy Holley's failure to report his use of force against Mr. Bryant is also outside the scope of generally accepted police practices and procedures.

As a result of the GCSO investigation, Deputy Holley was found not to have used excessive force against Mr. Bryant. The investigative findings state that there was no evidence of excessive force due to there being no apparent bruising or physical forensic evidence of injury to Mr. Bryant and because Mr. Bryant did not report any injuries upon his booking into the Santa Fe Jail. The findings also cite that Deputy Holley denies any choking of Mr. Bryant and Deputy Silvas denies seeing anything at all.  On this element I cannot agree with the GCSO findings, respectfully.  I reach this opinion for the following reasons.

Mr. Bryant complains, in a sworn affidavit, that Deputy Holley used his hand to choke him while he was handcuffed in the back seat of the patrol vehicle when the Deputy opened the back door of the patrol vehicle and engaged Mr. Bryant. Although there was no visible indication of physical injury observed on Mr. Bryant's neck, there is a witness statement by Ms. Bryant that she observed the patrol vehicle suddenly stop and she

observed a Deputy, later identified as Deputy Holley, exit the vehicle and open the back passenger door and Ms. Bryant heard the Deputy yelling at Mr. Bryant as the Deputy was facing into the backseat.

Further, because Deputy Holley did not activate audio or visual recording of the encounter and because Deputy Silvas reported he did not see any of Deputy Holley's actions while he was interacting with Mr. Bryant, in my professional opinion, this is insufficient evidence to rule out that Deputy Holley may have intentionally or inadvertently applied pressure to Mr. Bryant's neck, or impeded his breathing, during his encounter with Mr. Bryant in the back seat.

In fact, Deputy Holley himself admits it is "possible" that his hands made contact with Mr. Bryant's neck.  This is further supported by GCSO findings that Deputy Holley used unnecessary force against Mr. Bryant; that Deputy Holley was unprofessional in his interaction with Mr. Bryant; and that Deputy Holley did not file a written report on his use of force against Mr. Bryant.  When these facts are taken together, a reasonable person could believe that excessive force occurred. Indeed, such contradictory evidence and disputed facts are a matter for the trier of fact.

Deputy Silvas:

Based upon the investigative findings of the Galveston County Sheriff's Office, Deputy Silvas engaged in inappropriate conduct when he failed to file a written report documenting the use of force against Mr. Bryant. GCSO policy Reporting Use of Force, GC 202, states in part:

    A.   Responsibility for Reporting

    1.   (b) Any officer who witnesses a use of force by another officer of this agency shall advise a supervisor and shall submit a use of force report.

Based upon my professional training and experience, I agree with GCSO investigative findings that Deputy Silvas failed to properly document and submit a written use of force report as to the use of force by Deputy Holley. It is also my opinion that Texas peace officers are trained to be truthful in their reporting and that a reasonable, trained and similarly situated peace officer would not have failed to report the use of force by another officer on a citizen.  Peace officers are trained to follow their Department's policies and procedures and Deputy Silvas' failure to report the use of force against Mr. Bryant is also outside the scope of generally accepted police practices and procedures.

Based upon the investigative findings of the Galveston County Sheriff's Office, Deputy Silvas engaged in inappropriate conduct when he filed his written report concerning the arrest of Mr. Bryant and stated that he was transported to Jail without incident. GCSO policy Standards of Conduct GC.03 states in part:

    03.4 Procedures

C. Accountability, Responsibility and Discipline
5. Employees shall be accurate, complete and truthful in all matters.

Based upon my professional training and experience I agree with GCSO investigative findings that Deputy Silvas was untruthful in his written offense report when he reported that Mr. Bryant was transported to jail without incident. It is also my opinion that Texas peace officers are trained to be truthful in their official reports and that a reasonable, trained and similarly situated peace officer would not have reported that Mr. Bryant was transported to jail without incident, when in actuality there was an incident. Peace officers are trained to follow their Department's policies and procedures and Deputy Silvas' failure to be accurate, complete and truthful is also outside the scope of generally accepted police practices and procedures.

Additional Considerations

FTO Status:

Deputy Holley was serving in the role of a Field Training Officer (FTO). An FTO is a senior peace officer who provides field training to new officers after they have graduated from the police academy, or have joined the Department as the result of a lateral entry program after serving with another law enforcement agency. The FTO has a special role and should serve as a role model with regard to police practices and procedures. The FTO, while not generally an official supervisor, is responsible for training the new officer and for reviewing reports and activities of any officer assigned to him. FTOs complete training assessment reports on their trainees on a daily and weekly basis.

Based upon my training and experience, including having served as an FTO, trainees can be intimidated by FTOs due to the FTO's power and authority over them. For instance, a poor report from an FTO may result in a new officer being terminated from the Department for failing to successfully complete the field training program.

In the case at hand, GCSO investigative findings reported that Deputy Silvas did not see any of Deputy Holley's actions and that Deputy Silvas faced forward during the entire incident. Deputy Silvas also reported in his official offense report that Mr. Bryant was transported to jail without incident. It is my opinion that, more likely than not, the power disparity between Deputy Holley and Deputy Silvas was a contributing factor to Deputy Silvas' failure to document or report Deputy Holley's use of force against Mr. Bryant. However, it is the FTO's ultimate responsibility to make sure written reports are completed accurately and truthfully.

Failure to Obtain Medical Aid:

Based upon a review of the documents as they have thus far been presented, it does not appear the GCSO investigated or cited Deputy Holley, or Deputy Silvas, for any policy violations related to providing medical evaluation or treatment to Mr. Bryant. GCSO Policy Reporting Use of Force GC.202 states in part:

B. Referral/Transport for Medical Attention
1. Arresting and transporting officers shall ask prisoners whether they are injured or ill.
2. A suspect shall be examined by an appropriate health care provider prior to interrogation or prisoner processing for purposes of detention when suffering from or complaining of injury or illness… .

Based upon the GCSO investigative findings Deputy Holley and Deputy Silvas both recalled Mr. Bryant complaining that he had been choked and that his breathing had been impeded. GCSO investigative findings indicate Mr. Bryant did not tell booking personnel that he was injured. However, it appears that Mr. Bryant made his outcry while still in the custody of Deputy Holley and Deputy Silva. Failing to provide appropriate medical care based upon Mr. Bryant's complaint appears to be an additional violation of GCSO policies. Based upon my professional training and experience, Texas peace officers are trained to follow and obey Department policies. Texas peace officers are trained that they are responsible for the welfare of persons in their custody. Failing to respond to a medical complaint by a prisoner is also outside the scope of generally accepted police practices and procedures.

Failure to Seatbelt During Transport:

Based upon a review of the documents as they have thus far been presented, it does not appear the GCSO investigated or cited Deputy Holley, or Deputy Silvas, for any policy violation related to failing to properly secure a prisoner with a seatbelt. The GCSO investigative report includes Mr. Bryant's Citizen Complaint Form in which Mr. Bryant told Deputy Susan Hernandez that he was not seat-belted in the patrol vehicle. Further, Deputy Holley admitted in his deposition testimony that Mr. Bryant was not placed into a seatbelt.[13]

Based upon information as thus far presented, GCSO Policy, Transportation of Prisoners GC.227 states in part:

C. Transport
7. Prisoners shall be transported in a manner that allows for constant visual observation. Seating of officers and prisoners should conform with the following:
e. All prisoners shall be secured in the vehicle by proper use of a seatbelt.

Though Lieutenant Balchunas does not list this violation of GCSO policy in the GCSO investigative findings, because it was cited by Deputy Hernandez in her report, the allegation should have been investigated by the Office of Professional Standards.

Mr. Bryant's assertion has supporting evidence that he was not securely placed into the patrol vehicle based upon Deputy Holley's admission that Mr. Bryant was not seat belted in the back seat of the patrol vehicle. This is also consistent with Deputy Holley's

---

[13] Deposition of Deputy Holley, Page 56.

statement that, when he opened the rear passenger door of the patrol vehicle, Mr. Bryant swung his legs legs out of the back seat compartment of the patrol vehicle. Deputy Holley described this action as Mr. Bryant interpreting the opening of the back door to be an invitation to exit the patrol vehicle.

This is a critical fact that was omitted from the GCSO investigation as it is reasonable to believe Deputy Holley could have been on top of Mr. Bryant (who was handcuffed with his hands behind his back) because Mr. Bryant would not have been able to support himself and would have most likely ended up positioned on his back or side after being pushed without a seatbelt to support him thus creating the conditions that may have resulted in intentional or inadvertent use of hands by Deputy Holley about the neck of Mr. Bryant.

Furthermore, failing to properly secure a prisoner with a seatbelt is a serious safety violation. A prisoner who has his hands handcuffed behind his back is unable to brace himself should the vehicle be involved in any evasive action, sudden stops, or a traffic accident. This may cause severe injury or even death in a serious accident. Deputy Holley testified in his deposition that he did not know if seat belting a prisoner in his custody was the policy of the GCSO.[14] Based upon my training and experience, such policies are universal, regardless of agency.

Because Deputy Holley nor Deputy Silvas properly secured Mr. Bryant through the use of a seatbelt, it is my opinion that such an omission is a violation of the GCSO policies and procedures and should have been investigated as part of Mr. Bryant's complaint. Based upon my professional training and experience a reasonable, trained and similarly situated peace officer would not have failed to properly seatbelt and secure a prisoner during vehicle transport and that such conduct is outside the scope of generally accepted police practices and procedures. Likewise, Texas peace officers are trained to follow and obey their Department policies and, as such, failing to comply with Department policies is also outside the scope of generally accepted police practices and procedures.

In addition, it is my opinion that a proper internal affairs/professional standards review would have included an investigation into allegations of failing to seatbelt and safeguard a prisoner in the custody of the GCSO and that appropriate disciplinary action should have been taken against Deputy Holley and Deputy Silvas.  Failing to investigate a serious policy violation is outside the scope of generally accepted police practices and procedures.

Failure to Supervise:

The GCSO investigative findings report that Deputy Holley failed to file a written use of force report as previously discussed. The GCSO report states that Deputy Holley did verbally mention the incident to Sergeant Ostermayer later in the evening. Based upon this information Sergeant Ostermayer should have conducted an immediate investigation

---

[14] Deposition of Deputy Holley, Pages 56-57.

into the use of force by Deputy Holley. GCSO Policy, Reporting Use of Force, G.C.202, states in part:

202.4   Procedures

   C. Supervisory Responsibilities
     1. An officer's immediate supervisor shall be summoned and shall respond to any incident of use of force on a priority basis. In any instance of use of force the supervisor shall:
     a. document the officer's and suspect's statements of actions taken, injuries sustained, and medical treatment needed or desired;
     b. identify/interview witnesses as appropriate;
     c. document, as necessary, the scene of the incident;
     d. interview any healthcare provider concerning the injuries sustained and their consistency with uses of force; and
     e. shall review "the use of force" report the officer completed.
     2. The immediate supervisor shall notify the shift commander in cases involving injury or complaint of injury, hospitalization, or death of a person resulting or allegedly resulting from an officer's use of force.

Based upon the evidence as thus far submitted, there is no indication that Sergeant Ostermayer conducted an immediate use of force investigation as required by GCSO policy. The GCSO investigative findings are silent as to any inappropriate supervisory conduct in this matter. The field supervisor is in the best position to immediately investigate and document any reported use of force in a timely manner, gathering contemporaneous evidence.

Based upon my professional training and experience failing to investigate a report of use of force from a subordinate officer is outside the scope of generally accepted police practices and procedures. A reasonable, trained and similarly situated supervisor would have conducted a field use of force investigation. Likewise, Texas peace officers are trained to follow and obey their Department policies and, as such, failing to comply with Department policies is also outside the scope of generally accepted police practices and procedures.

In this particular case, the use of force against Mr. Bryant would have gone unreported but for Mr. Bryant's outcry. When supervisors fail to report or investigate use of force complaints this can be an indicator that use of force is tolerated within an agency and demonstrates a deliberate indifference on the part of management to hold officers accountable. The GCSO investigative findings do not discuss Sergeant Ostermayer's apparent failure to investigate the use of force against Mr. Bryant.

If, in fact, Sergeant Ostermayer did not conduct an immediate investigation into the use of force against Mr. Bryant, and GCSO senior management overlooked this act by not investigating or disciplining Sergeant Ostermeyer, senior GCSO

management appear they are condoning, or ratifying, the actions of GCSO supervisors who fail to properly investigate use of force incidents.

Based upon my professional training and experience failing to hold supervisors responsible for not following Department policies, particularly use of force related policies, is outside the scope of generally accepted police practices and procedures.

Failure to Train:

First area of concern is, according to GCSO findings, Deputy Silvas was cited for failing to be truthful and accurate in his report when he stated in the report that Mr. Bryant was transferred to jail without incident. Deputy Silvas admitted that he was trained to always put that phrase in his reports. Deputy Silvas also admitted he should not have used that phrase in this case since there was an incident. Using such "standard" phrases can, inadvertently or purposefully, cover up improprieties such as policy violations or use of force allowing these to go unreported.

Second area of concern is during Deputy Holley's deposition testimony, he admitted he was unaware of the GCSO policy requiring prisoners to be seat belted in a GCSO vehicle (see discussion on pages 14-15). This can lead to serious injury or death to prisoners in GCSO custody.

Third area of concern is during Deputy Holley's deposition, he testified that instructing new officers on the limitations of their use of force was not a part of the GCSO field training program and it was not his role to train officers on the limitations of use of force.[15]   This can lead to officers using excessive or unnecessary force against citizens.

Fourth area of concern is Deputy Holley also testified that he does not train new officers to report violations of policy by other officers. [16] This is clear evidence of what is commonly known as a "Blue Wall" or "Code of Silence" which refers to a practice within a law enforcement agency, often within the patrol/beat units, that encourages and condones officers to protect each other and to not "snitch" on other officers. Such conduct allows policy violations or use of force to go unreported, particularly when no corroborating evidence is available through video or witnesses.

Based upon my training and experience, the failure to train new officers to be truthful in their reports; the failure to train new officers on the protection of prisoners in their custody; the failure to train new officers to report policy violations by other officers;  and the failure to train new officers on the limitations of their use of force are all outside the scope of generally accepted police

---

[15] Deposition of Deputy Holley, Page 27.
[16] Deposition of Deputy Holley, Page 28.

practices and procedures and serves to create and support a culture that overlooks or minimizes the use of force by officers within the GCSO.

Previous Disciplinary History for Deputy Holley:

As part of a review of any use of force or police procedure incident it is important to evaluate whether there are previous incidents of policy violations or use of force. During the course of his deposition testimony, Deputy Holley testified that he had disciplinary or performance issues at three of the four law enforcement agencies he has worked for.

Deputy Holley testified that he previously worked with the Santa Fe, Texas Police Department.  Deputy Holley testified that he was terminated from the Santa Fe Police Department due to failing the field training program that was required of probationary officers.[17]

Deputy Holley testified that he received discipline while working with the Clear Lake Shores, Texas Police Department but could not remember what the discipline was for.[18] Based upon my training and experience, having issued discipline related counsels to officers, it is highly unusual for an officer to not recall the reason for receiving discipline as this is a significant event in an officer's career. Additional details are needed to properly evaluate whether this discipline would have any bearing on the case at hand.

Deputy Holley also testified that he received previous discipline from the Galveston County Sheriff's Office for Conduct Toward the Public for using foul language.[19] Based upon my training and experience, the use of foul language toward the public can be an indication of an officer's temperament. Failing to control one's temper can easily lead to an unnecessary or excessive force incident. Indeed, Deputy Holley was subsequently cited for Conduct Toward the Public and unnecessary force in the case at hand.

Because Deputy Holley cannot recall why he was disciplined by the Clear Lake Shores Police Department and because Deputy Holley was previous disciplined by GCSO for the same conduct he displayed in this case, there is an open question of fact as to whether Deputy Holley's previous actions are a contributing factor to this case.

---

[17] Deposition of Deputy Holley, Page 10.
[18] Deposition of Deputy Holley, Page 9.
[19] Deposition of Deputy Holley, Page 10.

*SUMMARY*

The following opinions are based upon the evidence as thus far submitted and reviewed.

1.  The Galveston County Sheriff's Office conducted an internal affairs investigation into Deputy Holley's use of force against Mr. Bryant. Their determination was that Deputy Holley used unnecessary force against Mr. Bryant. I agree with this finding.   I disagree with the GCSO finding that Deputy Holley did not use excessive force against Mr. Bryant because there is evidence that Deputy Holley lost his temper and was yelling at Mr. Bryant and was involved in a physical altercation with Mr. Bryant. In my opinion there is a question of fact as to whether Deputy Holley may have used excessive force against Mr. Bryant. Such excessive force actions are outside the scope of generally accepted police practices and procedures.

2.  The Galveston County Sheriff's Office conducted an internal affairs investigation into Deputy Holley's use of force against Mr. Bryant. Their determination was that Deputy Holley failed to report his use of force against Mr. Bryant.  I also agree with this finding and that such actions are outside the scope of generally accepted police practices and procedures.

3.  The Galveston County Sheriff's Office conducted an internal affairs investigation into Deputy Holley's treatment of Mr. Bryant. Their determination was that Deputy Holley was unprofessional in his demeanor and conduct toward Mr. Bryant.  I also agree with this finding and that such actions are outside the scope of generally accepted police practices and procedures.

4.  The Galveston County Sheriff's Office conducted an internal affairs investigation into Deputy Silvas' actions when force was used against Mr. Bryant. Their determination was that Deputy Silvas failed to report Deputy Holley's use of force against Mr. Bryant.  I also agree with this finding and that such actions are outside the scope of generally accepted police practices and procedures.

5.  The Galveston County Sheriff's Office conducted an internal affairs investigation into Deputy Silvas' inaccurate and untruthful report regarding use of force against Mr. Bryant. Their determination was that Deputy Silvas failed to accurately and truthfully report on the use of force against Mr. Bryant.  I also agree with this finding and that such actions are outside the scope of generally accepted police practices and procedures.

6.  The Galveston County Sheriff's Office failed to require activation of the rear seat camera during prisoner transports. This, more likely than not, was a contributing factor to the use of force against Mr. Bryant and the significant policy violations identified during the internal affairs investigation. This policy or practice is outside the scope of generally accepted police practices and procedures.

7. Deputy Holley failed to properly de-escalate the situation with Mr. Bryant and instead created an unnecessary person to person confrontation. This conduct is outside the scope of generally accepted police practices and procedures.

8. Deputy Holley, or Deputy Silvas, more likely than not, failed to properly seatbelt Mr. Bryant in the backseat of their patrol vehicle. This was also, more likely than not, a contributing factor to the use of force against Mr. Bryant. Such actions are outside the scope of generally accepted police practices and procedures.

9. The Galveston County Sheriff's Office failed to investigate or issue discipline regarding Mr. Bryant's complaint that he was not properly seatbelted in the patrol vehicle. Such actions are outside the scope of generally accepted police practices and procedures.

10. Deputy Holley and Deputy Silvas failed to provide immediate medical assistance to Mr. Bryant upon his complaining that he was choked by Deputy Holley and that his breathing had been impeded as required by Galveston County Sheriff's Office policies. Such actions are outside the scope of generally accepted police practices and procedures.

11. Sergeant Ostermayer failed to conduct an immediate use of force investigation after Deputy Holley verbally reported the incident involving Mr. Bryant, as required by Galveston County Sheriff's Office policies. Such an omission is outside the scope of generally accepted police practices and procedures and may indicate a deliberate indifference to the use of force by officers.

12. The Galveston County Sheriff's Office failed to investigate Sergeant Ostermayer for failing to investigate Deputy Holley's use of force against Mr. Bryant. Such actions are outside the scope of generally accepted police practices and procedures and may indicate a deliberate indifference to the use of force by officers.

13. The Galveston County Sheriff's Office failed to properly train Deputy Silvas to be truthful in his reporting of the use of force. Such actions are outside the scope of generally accepted police practices and procedures and may serve to ratify and condone use of force incidents by GCSO officers causing them to go unreported.

14. Deputy Holley and Deputy Silvas violated the Law Enforcement Code of Ethics, as recognized by the Texas Commission on Law Enforcement. Such actions are outside the scope of generally accepted police practices and procedures.

15. Deputy Holley and Deputy Silvas violated their sworn Oath of Office as recognized by the State of Texas. Such actions are outside the scope of generally accepted police practices and procedures.

16. The Galveston County Sheriff' Office failed to supervise Deputy Holley in his role as a Field Training Officer due to Deputy Holley's unfamiliarity or disregard

for GCSO policies on truthful incident reporting; safeguarding prisoners in custody;  legal limitations on the use of force by officers; and officers not reporting policy violations involving other officers. Such lack of supervision and/or training is outside the scope of generally accepted police practices and procedures.

My aforementioned opinions are based upon my 47 years of law enforcement and public safety experience and training and are based upon an objectively reasonable standard taking into consideration what was known to Deputy Holley, Deputy Silvas and Sergeant Ostermayer at the time and how a reasonable and similarly situated peace officer would react given generally accepted training and law enforcement procedures when considering the totality of the circumstances.

I reserve the right to review, modify or update my opinions based upon the introduction or withdrawal of any information relevant to the facts presented in this case.

Respectfully submitted on December 22nd, 2021.

/s/ *Keith A. Howse*
Keith A. Howse

## STATEMENT OF COMPENSATION

I have charged professional consulting fees to review this case and to prepare this report. Consulting fees are charged at the rate of $150 per hour.   I have received compensation of $1,500 as of the writing of this report.

## DECLARATION

My name is Keith A. Howse, my date of birth is 05-09-1960 and my address is 99 Trophy Club Drive Trophy Club, Texas, United States of America.  I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on the 22nd day of December 2021.

/s/ *Keith A. Howse*
Keith A. Howse

# Keith A. Howse
99 Trophy Club Drive
Trophy Club, Texas 76262
(817) 988-8443

| | |
|---|---|
| **Education** | Texas Wesleyan University School of Law – Fort Worth, Texas<br>(Now Texas A&M University School of Law)<br>Doctor of Jurisprudence – 1998 |
| | University of Texas at Arlington – Arlington, Texas<br>Bachelor of Arts in Criminology and Criminal Justice – 1995 |
| | Del Mar College – Corpus Christi, Texas<br>Associate of Applied Sciences in Police Science - 1980 |
| | Center for American and International Law<br>Institute for Law Enforcement Administration – Plano, Texas<br>School of Police Supervision – 1990 |

**Professional Experience**

Howse & Associates
99 Trophy Club Drive
Trophy Club, Texas 76262

<u>**Principal Consultant & Investigator**</u> **(2000 – Present)**
Provide professional criminal and civil investigative services for private and government clients throughout Texas. Conduct national security and public trust related background investigations on behalf of the United States Government. Provide public safety consulting services in matters of security and police practices, use of force, arrest, search and seizure, premises liability, inadequate security, and crime foreseeability. Serve as subject matter expert in State and Federal courts on issues involving law enforcement and security practices.

Baylor Department of Public Safety
3500 Gaston Avenue
Dallas, Texas (1982 - 2007)

<u>**Director - Public Safety/Assistant Chief of Police**</u> **(1997 - 2007)**
Provided direction and leadership to the 249 personnel of the Baylor Health Care System Department of Public Safety (BDPS), a special district police agency serving two urban planned development districts in Dallas, Texas known as Baylor University Medical Center, consisting of healthcare, academic, commercial, high-rise office, retail, multi-family residential, hotel, private/public parking, and special use properties. Managed comprehensive public safety program responsible for law enforcement, security, parking/traffic management, traffic safety, and emergency/fire safety planning programs. Provided senior management and budget accountability for all aspects of police and security services for 57 armed police officers and 140 unarmed security officers, plus support staff. Served as BDPS legal advisor for police and security matters. Reviewed all arrest and offense reports for accuracy and legality. Chaired Department Use of Force Review Committee. Testified before various state commissions on law enforcement related matters and monitored state legislative sessions to review proposed legislation impacting law enforcement operations.

**Captain of Police (1991 - 1997)**
Directed and managed personnel in the Support Services Division, including Training and Personnel, Firearms, Crime Prevention and Fire Prevention, and Security Technology Applications. Additional duties included planning and research, quality assurance and defensive driving coordinator, and community services programs. Instructed basic and in-service public safety related training programs to all DPS personnel. Served as training manager for the department and emergency management coordinator for natural and civil disasters. Approved all arrests and criminal offense reports as they related to the use of force by police and security officers.

**Lieutenant of Police (1986 - 1991)**
Managed the crime prevention and fire prevention unit as well as Parking & Traffic Division. Conducted fire/life safety inspections and educational programming. Managed recruiting and applicant testing to establish a qualified and diverse public safety workforce and conducted criminal investigations as assigned. Served as a patrol commander supervising one watch of police and public service officers. Performed as Field Training Officer for new recruits. Provided patrol services and approved all arrests and criminal offense reports.

**Corporal/Emergency Medical Technician - Field Training Officer (1985 - 1986)** Provided field training to new officers and functioned as weekend patrol supervisor. Prepared and reviewed daily incident reports and handled citizen complaints and inquiries. Performed routine patrol and first response emergency medical duties and criminal investigations as needed.

**Public Service Officer (1982 - 1985)**
Patrolled designated areas on foot and in marked patrol vehicles to deter and respond to criminal activity. Prepared detailed written reports concerning arrests and testified in court as necessary. Provided customer service such as motorist assistance, safety escorts and general assistance to members of the campus community. Served as relief dispatcher as needed.


Braniff International Airways, Inc.
Dallas-Fort Worth Airport, Texas (1981 - 1982)

Note: The company was declared bankrupt and dissolved in late 1980s.

**Lead Trainer  (December 1981- March 1982)**
Provided FAA approved security training to security screeners on the recognition and detection of weapons and explosives concealed on passengers and in passenger luggage.

**Security Screener  ( January 1981- December 1981)**
Screened passenger baggage for dangerous items, weapons, explosives and other prohibited materials at terminal security checkpoints.

**Current & Past Licenses and Certifications**

| | |
|---|---|
| Attorney & Counselor at Law | State Bar of Texas |
| Master Peace Officer Certification | Texas Commission on Law Enforcement |
| Advanced Peace Officer Certification | Texas Commission on Law Enforcement |
| Intermediate Peace Officer Certification | Texas Commission on Law Enforcement |
| Basic Peace Officer Certification | Texas Commission on Law Enforcement |
| Police Instructor | Texas Commission on Law Enforcement |
| Crime Prevention Inspector | Texas Commission on Law Enforcement |
| Security Manager | Texas DPS Private Security Bureau |
| Private Investigator | Texas DPS Private Security Bureau |
| Certified Protection Professional (CPP) | American Society for Industrial Security (ASIS) International |

**Professional Awards & Recognition**

Live-Saving Award
Meritorious Conduct Award
Academic Achievement Award
Director's Award
IACP National Civil Rights Recognition

**Current & Past Professional Affiliations**

American Bar Association
American Society for Industrial Security (ASIS) International
International Association of Chiefs of Police
International Association of Campus Law Enforcement Administrators
Institute for Law Enforcement Administration – Center for Law Enforcement Ethics
Texas Association of Licensed Investigators
Boy Scouts of America

**Government Security Clearances**

Top Secret (United States Department of Defense)

### Specialized Training & Continuing Education

Basic Police Academy
> North Central Texas Council of Governments Regional Police Academy-Arlington, Texas

Crime Prevention Inspector School (Commercial Business and Residential Security Assessments)
> Texas State University (Formerly Southwest Texas State University) – San Marcos, Texas

Advanced Crime Prevention School
> Texas State University (Formerly Southwest Texas State University) – San Marcos, Texas

Crime Prevention Through Environmental Design
> University of Louisville – Louisville, Kentucky

School of Police Supervision
> Institute for Law Enforcement Administration, Center For American & International Law – Plano, Texas

Advanced Management College
> Institute for Law Enforcement Administration, Center For American & International Law – Plano, Texas

Police Instructor School
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Field Training Officer School
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Sex Crimes Investigation School
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Crime Scene Investigation
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Use of Force
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Child Abuse Investigation
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Presidential Protection Detail Training Program
> United States Secret Service – Austin, Texas

Arrest, Search & Seizure
> North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Management of Aggression, Violence, & Intoxication Instructor Program
> Texas Hospital Association – Austin, Texas

Emergency Medical Technician – Basic School
> Baylor University Medical Center – Dallas, Texas

Defensive Driving Instructor Course
> National Safety Council – Dallas, Texas

CPR Instructor Course
> American Heart Association – Dallas, Texas

Explosives Recognition & Structural Firefighting Course
     Texas Engineering Extension Service, Texas A&M – College Station, Texas

Sixth Annual International Terrorism Seminar
     North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Police Personnel Recruitment & Selection Course
     North Central Texas Council of Governments Regional Police Academy – Arlington, Texas

Healthcare Security & Safety Management
     American Society of Hospital Engineering – Manhattan Beach, California

NCIC/TCIC Policy and Procedures
     Texas Department of Public Safety – Austin, Texas

Family Violence Investigation
     Baylor Health Care System Police – Dallas, Texas

Police Cultural Diversity
     Baylor Health Care System – Dallas, Texas

Police Contemporary Issues Conference – Use of Force/Police Pursuit
     Institute for Law Enforcement Administration, Center For American & International Law – Plano, Texas

Police Contemporary Issues Conference – Quality Management
     Institute for Law Enforcement Administration, Center For American & International Law – Plano, Texas

Police Compstat Crime Statistics Course
     Los Angeles Police Department – Los Angeles, California

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – Las Vegas, Nevada

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – Orlando, Florida

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – San Diego, California

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – New Orleans, Louisiana

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – San Antonio, Texas

American Society for Industrial Security (ASIS) International Annual Conference
     CPP/Security Continuing Education – Dallas, Texas

International Association of Chiefs of Police Annual Conference
     Police Continuing Education – Los Angeles, California

International Association of Chiefs of Police Annual Conference
     Police Continuing Education – Salt Lake City, Utah

International Association of Chiefs of Police Annual Conference
     Police Continuing Education – Charlotte, North Carolina

International Association of Chiefs of Police Annual Conference
        Police Continuing Education – Philadelphia, Pennsylvania

International Parking Institute Annual Conference
        Parking Management Continuing Education – Las Vegas, Nevada

American Society for Industrial Security (ASIS) International Annual Conference
        CPP/Security Continuing Education – Los Angeles, California

Warrantless Searches
        State Bar of Texas – Dallas, Texas

The Right of Police to Investigate
        State Bar of Texas – Dallas, Texas

Police Excessive Force/Police Pursuit
        State Bar of Texas – Dallas, Texas

USA Patriot Act
        State Bar of Texas – Dallas, Texas

Consequence of Illegal Immigration/Guns, Drugs, Illegal Aliens
        State Bar of Texas – Dallas, Texas

White Collar Crime Within the Healthcare Industry
        State Bar of Texas – Dallas, Texas

White Collar Crime and Federal Investigations
        State Bar of Texas – Dallas, Texas

Internet and Computer Crimes
        State Bar of Texas – Dallas, Texas

Police Training & Governmental Liability
        State Bar of Texas – Dallas, Texas

DWI & Breath and Blood Testing
        State Bar of Texas – Dallas, Texas

Police Practices – Arrest, Search & Seizure
        State Bar of Texas – Dallas, Texas

Immigration Law Enforcement
        State Bar of Texas – Dallas, Texas

Prosecution of Criminal Cases in a Corporate Environment
        State Bar of Texas – Dallas, Texas

Crime Scenes & Prosecutions
        State Bar of Texas – Dallas, Texas

Arrest, Search & Seizure – US Supreme Court Update
        State Bar of Texas

National Training Standards for Federal Background Investigators
        Keypoint Government Solutions – Loveland, Colorado

Human Trafficking
      Texas Commission on Law Enforcement – Austin, Texas

Advanced Human Trafficking
      OSS Academy – Austin, Texas

Legal Update
      Texas Commission on Law Enforcement – Austin, Texas

Open Carry Law Update
      Texas Commission on Law Enforcement – Austin, Texas

Civil Disturbance & Riot Control
      OSS Academy – Austin, Texas

Recording Law Enforcement Actions
      OSS Academy – Austin, Texas

Eyewitness Evidence
      OSS Academy – Austin, Texas

De-Escalation of Force
      OSS Academy – Austin, Texas

Negotiator Tactics
      OSS Academy – Austin, Texas

Psychological Evaluations in Criminal & Civil Cases
      State Bar of Texas – Austin, Texas

Use of Deadly Force in Texas
      State Bar of Texas – Austin, Texas

Fourth Amendment Legislative Update
      State Bar of Texas – Austin, Texas

Use of Force: Police Perspective
      State Bar of Texas – Austin, Texas

Human Trafficking & the Criminal Justice System
      State Bar of Texas – Austin, Texas

Illegal Evidence: Wiretapping/Hacking & Data Interception
      State Bar of Texas – Austin, Texas

Electronic Control Device-Basics
      OSS Academy-Austin, Texas

Recent Case History – Keith A. Howse

The following represents the cases in which I have testified in court or by deposition as an expert in the last four years.

Rose v. City of Utica, New York (2017) – United States District Court, Northern District of New York – Cause No. 6:14CV-1256 – Police Training-Police Procedure

Louis Doss & Carolyn Doss, d/b/a Mulligan's Pub v. City of Kerrville, et al. – San Antonio, Texas (2011/2017) United States District Court, Western District of Texas, San Antonio Division – Cause  No. SA 11CA0116 FB  Police Negligence – Police Procedure

Barbara Coats, et al. v. Harris County, et al. Houston, Texas (2017) – 61st Judicial District Court – Harris County, Texas – Cause No. 2012-55551 – Police Procedure - Police Training

Parker v. Briggs of De Gaulle, Inc., New Orleans, Louisiana (2017) – Civil District Court for the Parish of Orleans – Cause 2011-4030 – Security Procedure

Flowers v. JKS Security, et al. Dallas, Texas (2018) – 162nd Judicial District Court – Dallas County, Texas – Cause No. DC-16-09855 – Police Procedure-Security Procedure

Ruda v. State of New Jersey, et al. – Superior Court of New Jersey-Somerset County Division, New Jersey, (2020) - Docket No. SOM-L-533-17 – Security Practice & Procedure

Holman v. Harris County, et al. – Houston, Texas (2020) – United States District Court, Southern District of Texas-Houston Division-Civil Action 4:17-CV-01745 – Police Procedure

Ida Renae Nobles, et al. v. Sergeant Richard Egal, et al. – United States District Court, Western District of Texas-Austin Division – Civil Action 1:19-CV-00389 – Police Procedure