| User: BALCHB | GALVESTON COUNTY SHERIFF`S OFFICE | 03/08/2019 15:49:01 |
|---|---|---|

IA/PSD#: 201900003

## IA/PSD CASE REPORT

System #:   604

The information contained in this report is CONFIDENTIAL.

| File Class: | LEVEL 3 | Date Occurred: 12/14/2018 | Date Reported: 12/21/2018 |
|---|---|---|---|
| Comp Type: | CITIZEN | Time Occurred: | Time Reported: |
| Location: | 4500 TOWER RD GALVESTON COUNTY TX | | Beat: HWY   Zone: GCSO |
| Date IA/PSD: | | Date to Chain: | Date to Chief:   3-8-19   Date Expired: |
| Status: | Open | | Status Date:  01/24/2019   Assnd To: BALCHUNAS, B.W. |

_____ ASSOCIATED NAMES _____

```
CO  BRYANT,STEPHEN P              Sex:M Race:W  Age:28  4502 SOUTH TOWER RD.
AC  SILVAS,MARTIN L               Sex:M Race:W  Action:NONE
            ALLEGED RULE OF CONDUCT VIOLATED---------CLOSURE
            Accountability, Responsibility         Sustained
            Use Of Force-reporting                 Sustained


AC  HOLLEY,JAMES Z                Sex:M Race:W  Action:NONE
            ALLEGED RULE OF CONDUCT VIOLATED---------CLOSURE
            Use Of Force-reporting                 Sustained
            Use Of Force - Excessive               Not Sustained
            Use Of Force - Unnecessary             Sustained
            Conduct Towards Public                 Sustained
```

_____ NARRATIVE/NOTES _____

v

201900003

On 12-20-18, I went downstairs and met with Deputy Susan Hernandez and Stephen Patrick Bryant. Once Deputy Hernandez was through explaining the complaint process to Bryant, using my county issued I phone I took 23 photos of his face, neck, torso, legs etc. It should be noted that the photos were taken approximately 7 days from when the alleged incident had occurred. After later checking, I "did not notice" any finger(s), thumb(s) bruising, markings, etc., at the area of Bryant`s neck (on either side), that would be consistent with Deputy Holley (as indicated by Bryant to Deputy Hernandez) putting his hand around his neck and choking him for 5-6 seconds. One would think that even after a weeks` time, if someone was choked for that amount of time, some type of bruising or marks would be still be visible. There are none consistent with what is stated above. Also, Stephen Bryant apparently had not taken any photos of his neck area which may have been helpful. Fortunately, I happened to be in the area at the time to at least capture some type of documentation.

On 12-21-18, a Citizens Complaint Packet was received from Stephen Patrick Bryant III. The Complaint Affidavit had been notarized by Robin Embry #5815969.

I then reviewed the Complaint Affidavit and learned the following. Bryant states he was

*iamain*                                                                    Page 1

takes one of the small kids out of the vehicle and walks towards her residence with the child.

At approximately 23:14, the blue vehicle had made a turn around and pulled into the driveway of 4502 Tower Road (the Bryant Residence) and goes out of view.

At approximately 23:04:46, the camera shuts off after Deputy Silvas entered the drives seat, and Deputy Holley entered the front passenger seat.

I asked if anyone else was here on that day, or any friend's relatives in another vehicle etc.  Kristen advised her co-worker had come out and that she had already left by that time.  (The time of the incident that Stephen Bryant was reporting)

I ask if she recalled any vehicle pulling into her driveway on that night.  She replied, no.  She also advised there were no other vehicles that arrived such as friends etc., referring to on the night of this incident.  She again advised she did not see any car pull into her driveway.

I asked if she was in a vehicle at all, on the particular night.  She replied, `no.` She also advised she was in her front yard the whole time.

I asked if she saw the Deputies come and get into the patrol car.  (Just prior to leaving the scene)  She replied, `yea.`  She confirmed her husband was in the back of the car (patrol unit) at this time.

Kristen confirmed that after the deputies got her information that got into the car (patrol unit) and pulled off like they was going to take him to the jail, (county jail).

She again advised there was no one else with her when this occurred.  (The incident reported by Stephen Bryant)  She also indicated she was in her driveway at the end of her trailer when the incident occurred.  She also confirmed this is where the deputies had left her once they got her information.

Kristen then confirmed the patrol unit then stopped in front of the driveway (neighbors) that was approximately 30 yards from her driveway.

I asked how much time was it from when they left until they reached the neighbor's driveway.  She stated, `it couldn't have been any more than a minute.`  She advised they pulled off slow.  She then advised it took approximately 20-30 seconds for them to reach the neighbor's driveway.

I asked if she noticed who was driving the vehicle when they had left.  She indicated she believes the other deputy was driving and she believes his name is Silvas.

She indicated when the vehicle stopped, it was like they were, `slamming on the breaks.`  She advised Holley then got out of the passenger side of the car.  She indicated she did not see the other deputy (Silvas) move or get out of the vehicle as she did not see his door open.

She advised that Deputy Holley jumped into the back passenger side of the vehicle.  (Back right side)

I asked Kristen for her to tell me about how he jumped into the vehicle.  She advised he opened the door to the back of the car and jumped into the back of the car.

I asked Kristen (who confirmed the back door was opened) if she could see anything else. She advised if was fairly dark at the time, her neighbors had lights however, she couldn't really see exactly what was going on in the back of the vehicle however, stating, ` I did see him jump into the back of the vehicle.`

I then asked what was the position of his (Deputy Holley's) body. She advised his chest was facing the inside of the car, `so, kind of head first.` I then confirmed from the right rear into the back of the car.

Upon asking if she saw anything when he was in the back of the car, or could she tell what was going on. Kristen advised it just appeared that they were struggling, and she couldn't really see exactly what was going on, and it appeared that they were having a little bit of a struggle between the two.

I advised regarding the struggle that she described, how long would she say that it had lasted. Kristen replied, `that a minute to 3 minutes, no more than.` She then advised maybe like 2 minutes. She then confirmed about 2 minutes, `gave or take.`

Upon my asking if she heard anything, Kristen stated, `she heard yelling,` and it didn't sound like her husband's voice, and she couldn't make out what was being said, and she heard some loud voices that appeared to be yelling.`

Upon my asking she advised the door was opened the whole time.

I asked (after the 2 minutes) what happened then. She advised he (Deputy Holley) got back into the car, they pulled off again, and he took a right at the stop sign. (Turned westbound on to Fir Road)

I then asked if it was closer to 1 minute, 2 minutes, or 3 minutes that they were there. Kristen indicated 2. I asked if she was pretty sure that they were there about that time. She replied, `yea.`

I advised it wasn't like 10, 15, or 30 seconds. She advised it was two minutes or less for sure. She then advised probably closer to a minute. I advised her I know this was several weeks ago. I advised at first she said 3, then 2 minutes, and she advised that it would have possibly have been a minute. I asked if it could have been less than a minute. She replied, `she would say it was close to minute, if it was less than a minute it would probably be at least 40 seconds or better. Basically I was trying to narrow down her time line, as she seemed uncertain as to the time duration this incident occurred.

I asked if she noticed if anyone else was out there at the time. Kristen replied, `no.` I asked if she knows anyone who drives a small little blue car. She replied, `no.`

She again (to clarify) advised she did not have any friends over, she was not in any kind of vehicle on that night, and none of her friends were either. Kristen replied, `right.` I then stated on that night. She replied, `right.`

Kristen then advised that her co-worker had come out, she was the one who actually called the police, and she had already left by that time.

I asked how much time the co-worker had left before they (the deputies) had went down the street. (To transport to the jail). Kristen then indicated the coworker had left about

Page 10

December 2018 he was at the scene with Deputy Holley that led to the arrest. He advised he later departed. Sgt. Ostermayer advised Deputy Holley later did call him however he was not sure of the when and the time, to advised he had an incident with Stephen Bryant, saying he had to get him back in the car however, Sgt. Ostermayer advised he doesn`t recall exactly what was said.

The brief voice message will be recorded on to DVD and attached to this report.

The allegation that Deputy Martin Silvas # 8018 violated Galveston County Sheriff`s Office Policies, #1. 03.4 C. 5. Accountability, Responsibility and Discipline. Employees shall be accurate, compete, and truthful in all matters is SUSTAINED.

This is based on the following:

"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

"   Stephen Bryant was then arrested for Assault Family Violence, Evading Arrest, and transported to Santa Fe PD Jail according to RMS Case Report (1800004732) generated by Deputy Silvas who wrote the report.

"   The report indicates that ADA James Haugh authorize the Assault charge and set bond at $5,000.00, and that Stephen Bryant was then TRANSPORTED TO SANTA FE CITY JAIL FOR BOOKING, WITHOUT INCIDENT.

"   On 12-21-18, Stephen Bryant made an official complaint indicating advised once the scene was concluded the deputies (Silvas and Holly) returned to the car and departed. He advised that approximately one minute later while in route to Santa Fe PD, Deputy Holley yelled to `stop the car.` Bryant stated that Deputy Holley then opened the back door where he (Bryant) was located, and then Holley put his hand around his neck and ended up laying on top of him in the back seat, telling him to shut his mouth while he choked him.

"   On 12-31-18, Patrol Captain T.K. Keele was requested to have Deputy Martin Silvas submit a memo/documentation for any occurrences that may have taken place from the time they left the scene, to the booking area of Santa Fe PD and clearing the call.

"   Deputy Silvas later sends Captain Keele documentation stating that Bryant became hostile, stated his hate for the police, and made loud vulgar remarks towards them. This was not indicated in the Offense Report.

"   The email indicates Deputy Holley ask for Deputy Silvas to stop the car and that Deputy Holley exited the vehicle, opened the rear passenger door, and told the Bryant he needed to calm down. This was not indicated in the Offense Report.

"   The email indicates that Bryant continued to rant on, called them out of name, and tried to `exit the vehicle.` This was not indicated in the Offense Report.

"   The email indicates that Deputy Holley kept his ground and was able to push/swing Bryant`s legs back into the vehicle and after securing him, the patrol door was closed and they continued to Santa Fe PD. This was not indicated in the Offense Report.

"   This documentation clearly negates Deputy Silvas`s RMS Report that states, Stephen was then transported to Santa Fe Jail, WITHOUT INCIDENT, as this confrontation with Stephen

Bryant was not documented in the RMS Report.

"   A witness statement taken from Kristen Bryant indicates that after the deputies departed with her husband Stephen just a short distance from their residence, the patrol unit stopped suddenly, and she saw Deputy Holley open the rear patrol door and get on her husband, and she heard loud yelling going on.

"   During Deputy Silvas's interview, he confirmed and he acknowledged the Offense Report basically indicates that Bryant was transported to Santa Fe PD without incident.

"   During his interview he advised that Deputy Holley was arguing and talking with Bryant trying to calm him down, and that Stephen Bryant tried to get out, and that Deputy Holley kept his ground, and swung and pushed his legs back in.`

"   During his interview Deputy Silvas states `the only thing he saw him do was get out of the car, and open the back door.`

"   During his interview Deputy Silvas states, he `faced forward, Deputy Holley got back into the car,` and he told him that he almost fell, and in the process he got kicked, and he pushed him back in the car.`

"   During his interview Deputy Silvas stated he heard Stephen Bryant tell Deputy Holley that he just committed a felony by impeding his breath.

"   During his interview, Deputy Silvas was asked if it was a true statement that he didn't have any incidents while they were going to the Santa Fe City Jail and I ask if that was true.  He then replied, `no sir.`    I then stated, `it was not true is that correct.` Deputy Silvas replied, `yes sir.`

"   During his interview Deputy Silvas was asked if he was accurate and truthful in all matters when he wrote this Offense Report.  He replied, `I guess no because, since I put, `no incident occurred.`` He then added, `without incident,` `no, because an incident did occur.`

"   Even though Deputy Silvas states he did not see Deputy Holley's actions regarding Stephen Bryant, he very clearly, based on the above stated, was fully aware that a reportable incident had occurred and neglected to do so.

"   Deputy Silvas omitted this incident in his Offense Report, and did not even acknowledge an incident occurred until being advised he needed too. (If one had occurred)

"   It should also be noted, that Deputy Silvas at the time was an inexperienced Patrol Deputy who was in a training phase at the time, to become a Patrol Deputy.

The allegation that Deputy Martin Silvas # 8018 violated Galveston County Sheriff Office Policy; Reporting Use of Force---202.4   A. Responsibility for Reporting.   1. (B). Any Officer who witnesses a use of force by another officer of this agency shall advise a supervisor and shall submit a use of force report is SUSTAINED.             .

This is based on the following:

"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

Bryant was not documented in the RMS Report.

"   A witness statement taken from Kristen Bryant indicates that after the deputies departed with her husband Stephen just a short distance from their residence, the patrol unit stopped suddenly, and she saw Deputy Holley open the rear patrol door and get on her husband, and she heard loud yelling going on.

"   During Deputy Silvas's interview, he confirmed and he acknowledged the Offense Report basically indicates that Bryant was transported to Santa Fe PD without incident.

"   During his interview he advised that Deputy Holley was arguing and talking with Bryant trying to calm him down, and that Stephen Bryant tried to get out, and that Deputy Holley kept his ground, and swung and pushed his legs back in.`

"   During his interview Deputy Silvas states `the only thing he saw him do was get out of the car, and open the back door.`

"   During his interview Deputy Silvas states, he `faced forward, Deputy Holley got back into the car,` and he told him that he almost fell, and in the process he got kicked, and he pushed him back in the car.`

"   During his interview Deputy Silvas stated he heard Stephen Bryant tell Deputy Holley that he just committed a felony by impeding his breath.

"   During his interview, Deputy Silvas was asked if it was a true statement that he didn't have any incidents while they were going to the Santa Fe City Jail and I ask if that was true.  He then replied, `no sir.`    I then stated, `it was not true is that correct.` Deputy Silvas replied, `yes sir.`

"   During his interview Deputy Silvas was asked if he was accurate and truthful in all matters when he wrote this Offense Report.  He replied, `I guess no because, since I put, `no incident occurred.`` He then added, `without incident,` `no, because an incident did occur.`

"   Even though Deputy Silvas states he did not see Deputy Holley's actions regarding Stephen Bryant, he very clearly, based on the above stated, was fully aware that a reportable incident had occurred and neglected to do so.

"   Deputy Silvas omitted this incident in his Offense Report, and did not even acknowledge an incident occurred until being advised he needed too. (If one had occurred)

"   It should also be noted, that Deputy Silvas at the time was an inexperienced Patrol Deputy who was in a training phase at the time, to become a Patrol Deputy.

The allegation that Deputy Martin Silvas # 8018 violated Galveston County Sheriff Office Policy; Reporting Use of Force---202.4   A. Responsibility for Reporting.   1. (B). Any Officer who witnesses a use of force by another officer of this agency shall advise a supervisor and shall submit a use of force report is SUSTAINED.             .

This is based on the following:

"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

"     Stephen Bryant was then arrested for Assault Family Violence, Evading Arrest, and transported to Santa Fe PD Jail according to RMS Case Report (1800004732) generated by Deputy Silvas who wrote the report.

"     The report indicates that ADA James Haugh authorize the Assault charge and set bond at $5,000.00, and that Stephen Bryant was then TRANSPORTED TO SANTA FE CITY JAIL FOR BOOKING, WITHOUT INCIDENT.

"     On 12-21-18, Stephen Bryant made an official complaint indicating advised once the scene was concluded the deputies (Silvas and Holly) returned to the car and departed.  He advised that approximately one minute later while in route to Santa Fe PD, Deputy Holley yelled to `stop the car.`  Bryant stated that Deputy Holley then opened the back door where he (Bryant) was located, and then Holley put his hand around his neck and ended up laying on top of him in the back seat, telling him to shut his mouth while he choked him.

"     On 12-31-18, Patrol Captain T.K. Keele was requested to have Deputy Martin Silvas submit a memo/documentation for any occurrences that may have taken place from the time they left the scene, to the booking area of Santa Fe PD and clearing the call.

"     Deputy Silvas later sends Captain Keele documentation stating that Bryant became hostile, stated his hate for the police, and made loud vulgar remarks towards them.  This was not indicated in his Offense Report.

"     The email indicates Deputy Holley ask for Deputy Silvas to stop the car and that Deputy Holley exited the vehicle, opened the rear passenger door, and told the Bryant he needed to calm down.  Deputy Silvas had heard this.  This was not indicated in his Offense Report.

"     The email indicates that Bryant continued to rant on, called them out of name, and tried to `exit the vehicle.`  Deputy Silvas would have heard the verbal assaults from Bryant.  This was not indicated in his Offense Report.

"     The email indicates that Deputy Holley kept his ground and was able to push/swing Bryant`s legs back into the vehicle and after securing him, the patrol door was closed and they continued to Santa Fe PD.  Deputy Sivas during this interview stated he was told this occurred by Deputy Holley. Being a few feet away, he had to be completely aware a reportable incident had occurred.

"     This documentation clearly negates Deputy Silvas`s RMS Report that states, Stephen was then transported to Santa Fe Jail, WITHOUT INCIDENT, as this confrontation with Stephen Bryant was not documented in the RMS Report.

"     A witness statement taken from Kristen Bryant indicates that after the deputies departed with her husband Stephen just a short distance from their residence, the patrol unit stopped suddenly, and she saw Deputy Holley open the rear patrol door and get on her husband, and she heard loud yelling going on.  Deputy Silvas indicated yelling was going on during the incident in him memo.

"     During Deputy Silvas`s interview, he confirmed and he acknowledged the Offense Report basically indicates that Bryant was transported to Santa Fe PD without incident.

"   During his interview he advised in his memo, that Deputy Holley was arguing and talking with Bryant trying to calm him down, and that Stephen Bryant tried to get out, and that Deputy Holley kept his ground, and swung and pushed his legs back in.` Deputy Silvas was present in the Patrol Unit when this occurred.

"   During his interview Deputy Silvas states `the only thing he saw him do was get out of the car, and open the back door.` Deputy Silvas clearing heard the commotion that was going on.

"   During his interview Deputy Silvas states, he `faced forward, Deputy Holley got back into the car,` and he told him that he almost fell, and in the process he got kicked, and he pushed him back in the car.`

"   During his interview Deputy Silvas stated he heard Stephen Bryant tell Deputy Holley that he just committed a felony by impeding his breath. This was not indicated in the offense report.

"   During his interview, Deputy Silvas was asked if it a true statement that he didn`t have any incidents while they were going to the Santa Fe City Jail and I ask if that was that true. He then replied, `no sir.`   I then stated, `it was not true is that correct.` Deputy Silvas replied, `yes sir.`

"   During his interview Deputy Silvas was asked if he was accurate and truthful in all matters when he wrote this Offense Report. He replied, `I guess no because, since I put, `no incident occurred.` He then added, `without incident,` `no, because an incident did occur.`

"   Even though Deputy Silvas states he did not see Deputy Holley`s actions regarding Stephen Bryant, he very clearly, based on the above stated, was fully aware that a reportable incident had occurred and neglected to do so.

"   Deputy Silvas omitted this incident in his Offense Report, and did not even acknowledge an incident occurred until being advised he needed too. (If one had occurred)

"   During his interview I asked if he notified the supervisor regarding the use of force he witnessed in the rear seat. He replied, `no sir.`

"   During the interview Deputy Silvas was ask if he submitted a use of force report regarding this incident, and he indicated, `he had not.` According to policy, he clearly should have.

"   It should also be noted, that Deputy Silvas at the time was an inexperienced Patrol Deputy who was in a training phase at the time, to become a Patrol Deputy.
The allegation that Deputy James Zachary Holley may have violated Galveston County Sheriff`s Office Policies:  #1. Reporting Use of Force---202.4   A. Responsibility for Reporting   1. Officers shall make and immediate verbal report to their supervisors following any reportable use of force and file a written incident report and
B. Each officer who uses force in an incident shall submit a separate written use of force report, IS SUSTAINED.

Page 34

This is based on the following.

"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

"   Stephen Bryant was then arrested for Assault Family Violence, Evading Arrest, and transported to Santa Fe PD Jail according to RMS Case Report (1800004732) generated by Deputy Silvas who wrote the report.

"   The report indicates that ADA James Haugh authorize the Assault charge and set bond at $5,000.00, and that Stephen Bryant was then TRANSPORTED TO SANTA FE CITY JAIL FOR BOOKING, WITHOUT INCIDENT.

"   On 12-21-18, Stephen Bryant made an official complaint indicating advised once the scene was concluded the deputies (Silvas and Holly) returned to the car and departed. He advised that approximately one minute later while in route to Santa Fe PD, Deputy Holley yelled to `stop the car.` Bryant stated that Deputy Holley then opened the back door where he (Bryant) was located, and then Holley put his hand around his neck and ended up laying on top of him in the back seat, telling him to shut his mouth while he choked him.

"   On 12-31-18, Patrol Captain T.K. Keele was requested to have Deputy Martin Silvas submit a memo/documentation for any occurrences that may have taken place from the time they left the scene, to the booking area of Santa Fe PD and clearing the call.

"   Deputy Silvas later sends Captain Keele documentation stating that Bryant became hostile, stated his hate for the police, and made loud vulgar remarks towards them. This was not indicated in the Offense Report.

"   The email indicates Deputy Holley ask for Deputy Silvas to stop the car and that Deputy Holley exited the vehicle, opened the rear passenger door, and told the Bryant he needed to calm down. This was not indicated in the Offense Report.

"   The email indicates that Bryant continued to rant on, called them out of name, and tried to `exit the vehicle.` This was not indicated in the Offense Report.

"   During his interview Deputy Holley advised he was working on December 14th 2018 from 6 P.M. to 6 A.M. for the Hwy 6 District.

"   During his interview Deputy Holley indicated, `almost immediately upon putting the vehicle in drive, Bryant became extremely belligerent and hostile.` This is not indicated in the Offense Report.

"   During his interview Deputy Holley advised Bryant was kicking around, screaming at the `top of his lungs.` Deputy Holley further indicated he don`t recall ever been called so many vulgarities in such a short period of time. He advised they did not get very far down the road before he thought, this guy needs to calm down or Santa Fe is not going to accept him in the jail. This is not indicated in the Offense Report.

"   During his interview Deputy Holley advised he directed Deputy Silvas to stop the car. Upon my asking he advised they were maybe 100 feet from the original location, and they had `been rolling for seconds.` He advised it was almost instantly when he (Bryant) `just exploded.` This is not indicated in the Offense Report.

" During his interview Deputy Holley advised when he did open the door, `he seemed to take this as an invitation to exit the vehicle.` Deputy Holley advised he was not going to allow this to happen. Deputy Holley states, `so he starts to come out of the vehicle, he started to push him back into the vehicle.` He then states `he struggled against me, and kept continuously trying to exit the car.` This is not indicated in the Offense Report.

" During the interview Deputy Holley advised he notified his supervisor of the incident, and this was confirmed. He however advised he did not complete a use of force report. According to policy, this should have been completed in this situation.

#2.     Procedures E. Limitations on Use of Force 201.4 E.1
2. Application of a choke hold or carotid control hold is prohibited, except when an officer reasonably believes such holds are the only means of protecting himself or another person from imminent threat of serious bodily injury or death and the use of deadly force would be authorized is NOT SUSTAINED.

This is based on the following.

" On 12-20-18, I went downstairs and met with Deputy Susan Hernandez and Stephen Patrick Bryant. Once Deputy Hernandez was through explaining the complaint process to Bryant, using my county issued I phone I took 23 photos of his face, neck, torso, legs, etc.

" It should be noted that the photos were taken approximately 7 days from when the alleged incident had occurred.

" After later checking, I "did not notice" any finger(s), thumb(s) bruising, markings, etc., at the area of Bryant`s neck (on either side), that would be consistent with Deputy Holley (as indicated by Bryant to Deputy Hernandez) putting his hand around his neck and choking him for 5-6 seconds. This is very significant.

" One would think that even after a weeks` time, if someone was choked for that amount of time, some type of bruising or marks would be still be visible. There "are none" consistent with what is stated above.

" Also, Stephen Bryant apparently had not taken any photos of his neck area which may have been helpful. Fortunately, I happened to be in the area at the time to at least capture some type of documentation.

" In Stephen Bryant`s Complaint Affidavit he indicated Deputy Holley put his hand around his neck, and ended up laying on top of him in the back seat, telling him to shut his mouth while HE CHOKED HIM.

" Deputy Holley denies doing this during his interview

" Deputy Silvas did not see this occur.

" Kristen Bryant did not see this occur.

" This is no video evidence.

" Stephen Bryant did not indicate to medical staff at the jail that he needed to be checked, because he had been `choked.`

Page 36

"   With camera availability in this current day and time, if there was any photographic evidence supportive that he had been choked, Stephen Bryant could have easily had done this, or could had someone taken photos of any existing evidence.  This was not done by him.

"   Even though his attorney stated Bryant would take a polygraph, the photographic documentation `does not` support that Deputy Holley `had choked,` Stephen Bryant.

"   Had I have not been in the office when Stephen Bryant had met with Deputy Hernandez to take these photos, it would have made it much more difficult to disprove the allegation made by Bryant.

"   I do believe it is possible that minimal contact between the hand of Deputy Holley and the neck of Stephen Bryant `may` have occurred during the struggle.  I do not believe however, (based strongly on the photo documentation) that Deputy Holley intentionally, consciously, and knowingly, placed his hand around the neck of Stephen Bryant and `choked him.`   The evidence simply does not exist.

\# 3.     Use of Non-Deadly Force    201.4    D 1.
2.  Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control is SUSTAINED.


This is based on the following.

"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

"   Stephen Bryant was then arrested for Assault Family Violence, Evading Arrest, and transported to Santa Fe PD Jail according to RMS Case Report (1800004732) generated by Deputy Silvas who wrote the report.

"   The report indicates that ADA James Haugh authorize the Assault charge and set bond at $5,000.00, and that Stephen Bryant was then TRANSPORTED TO SANTA FE CITY JAIL FOR BOOKING, WITHOUT INCIDENT.

"   On 12-21-18, Stephen Bryant  made an official complaint indicating advised once the scene was concluded the deputies (Silvas and Holly) returned to the car and departed.  He advised that approximately one minute later while in route to Santa Fe PD, Deputy Holley yelled to `stop the car.`  Bryant stated that Deputy Holley then opened the back door where he (Bryant) was located, and then Holley put his hand around his neck and ended up laying on top of him in the back seat, telling him to shut his mouth while he choked him.

"   On 12-31-18, Patrol Captain T.K. Keele was requested to have Deputy Martin Silvas submit a memo/documentation for any occurrences that may have taken place from the time they left the scene, to the booking area of Santa Fe PD and clearing the call.

"   Deputy Silvas later sends Captain Keele documentation stating that Bryant became hostile, stated his hate for the police, and made loud vulgar remarks towards them.  This was not indicated in the Offense Report.

"   The email indicates Deputy Holley ask for Deputy Silvas to stop the car and that Deputy Holley exited the vehicle, opened the rear passenger door, and told the Bryant he needed to

calm down.  This was not indicated in the Offense Report.

"    The email indicates that Bryant continued to rant on, called them out of name, and tried to `exit the vehicle.`  This was not indicated in the Offense Report.

"    During his interview Deputy Holley advised he was working on December 14th 2018 from 6 P.M. to 6 A.M. for the Hwy 6 District.

"    During his interview Deputy Holley indicated, `almost immediately upon putting the vehicle in drive, Bryant became extremely belligerent and hostile.  This is not indicated in the Offense Report.

"    During his interview Deputy Holley advised Bryant was kicking around, screaming at the `top of his lungs.`  Deputy Holley further indicated he don`t recall ever been called so many vulgarities in such a short period of time.  He advised they did not get very far down the road before he thought, this guy needs to calm down or Santa Fe is not going to accept him in the jail.  This is not indicated in the Offense Report.

"    During his interview Deputy Holley advised he directed Deputy Silvas to stop the car.  Upon my asking he advised they were maybe 100 feet from the original location, and they had `been rolling for seconds.`  He advised it was almost instantly when he (Bryant) `just exploded.`  This is not indicated in the Offense Report.

"    During his interview Deputy Holley advised when he did open the door, `he seemed to take this as an invitation to exit the vehicle.`  Deputy Holley advised he was not going to allow this to happen.  Deputy Holley states, `so he starts to come out of the vehicle, he started to push him back into the vehicle.`  He then states `he struggled against me, and kept continuously trying to exit the car.`  This is not indicated in the Offense Report.

"    During his interview I ask if Bryant was attempting to `kick the windows out of the unit.`  Deputy Silvas indicated he did not. He replied, `he was kicking the cage.`  He further indicated it is so confining in that unit there is no way to lift up the legs high enough to kick the windows.  He again advised he does remember him kicking the cage.  Deputy Silvas did not indicate this occurring.

"    I ask if Bryant was `banging his head against anything.`  Deputy Silvas indicated he did not.  Deputy Holley replied, `he does not know because he was positioned directly behind him.`

"    I ask if Bryant was yelling out there was some type of emergency, they needed to stop, etc.  Deputy Holley stated, `no sir.`

"    I ask if he was attempting to injure himself in any way. Deputy Silvas indicated he did not.  He replied, `he can`t speak to it.`  He again advised he was positioned directly behind him and he did not have a direct view of what he was doing.

"    During his interview I ask, `going back and in retrospect, was it necessary to open up that patrol car door.`  Deputy Holley stated, `absolutely not, no.`  He added, `what we should have done was just keep driving, and endure and ignore is what should have happened, that was an error in judgement on his part to think that he should talk to this guy, they should have just kept going.`

"    During his interview, Deputy Silvas indicated there was no reason to stop the patrol car.

"   In this situation where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control. Physical force `was not at all justified.` Bryant was not a threat, he was not damaging the unit, he was not injuring himself, he was only yelling at the deputies. The fact that Deputy Holley had trainee Deputy Silvas stop the patrol unit and go back and open the door to an already combative arrestee, clearly backfired on Deputy Holley who states, he wanted to talk to him `face to face`.

"   Had Deputy Holley not have unjustifiably opened up the patrol door where a clearly combative and belligerent subject was located, THIS INCIDENT WOULD NOT HAVE OCCURRED AT ALL. Therefore, Deputy Holley was unjustified in using physical force against Stephen Holley.

# 4.     Procedures    03.4   E.3
         1, While recognizing the need to demonstrate authority and control over criminal suspects and prisoners, officers shall adhere to this agency's use-of-force policy and shall observe the civil rights and protect the well - being of those in their charge IS SUSTAINED.


This is based on the following.
"   On 12-14-18, Deputy Martin Silvas and Deputy James Holley responded to 4502 Tower Road in Santa Fe in reference to a physical disturbance.

"   Stephen Bryant was then arrested for Assault Family Violence, Evading Arrest, and transported to Santa Fe PD Jail according to RMS Case report (1800004732) generated by Deputy Silvas who wrote the report.

"   The report indicates that ADA James Haugh authorize the Assault charge and set bond at $5,000.00, and that Stephen Bryant was then TRANSPORTED TO SANTA FE CITY JAIL FOR BOOKING, WITHOUT INCIDENT.

"   On 12-21-18 Stephen Bryant made an official complaint indicating advised once the scene was concluded the deputies (Silvas and Holly) returned to the car and departed. He advised that approximately one minute later while in route to Santa Fe PD, Deputy Holley yelled to `stop the car.` Bryant stated that Deputy Holley then opened the back door where he (Bryant) was located, and then Holley put his hand around his neck and ended up laying on top of him in the back seat, telling him to shut his mouth while he choked him.

"   On 12-31-18, Patrol Captain T.K. Keele was requested to have Deputy Martin Silvas submit a memo/documentation for any occurrences that may have taken place from the time they left the scene, to the booking area of Santa Fe PD and clearing the call.

"   Deputy Silvas later sends Captain Keele documentation stating that Bryant became hostile, stated his hate for the police, and made loud vulgar remarks towards them. This was not indicated in the Offense Report.

"   The email indicates Deputy Holley ask for Deputy Silvas to stop the car and that Deputy Holley exited the vehicle, opened the rear passenger door, and told the Bryant he needed to calm down. This was not indicated in the Offense Report.

"   The email indicates that Bryant continued to rant on, called them out of name, and tried to `exit the vehicle.` This was not indicated in the Offense Report.

"   During his interview Deputy Holley advised he was working on December 14th 2018 from 6 P.M. to 6 A.M. for the Hwy 6 District.

"   During his interview Deputy Holley indicated, `almost immediately upon`putting the vehicle in drive, Bryant became extremely belligerent and hostile. This is not indicated in the Offense Report.

"   During his interview Deputy Holley advised Bryant was kicking around, screaming at the `top of his lungs.` Deputy Holley further indicated he don`t recall ever been called so many vulgarities in such a short period of time. He advised they did not get very far down the road before he thought, this guy needs to calm down or Santa Fe is not going to accept him in the jail. This is not indicated in the Offense Report.

"   During his interview Deputy Holley advised he directed Deputy Silvas to stop the car. Upon my asking he advised they were maybe 100 feet from the original location, and they had `been rolling for seconds.` He advised it was almost instantly when he (Bryant) `just exploded.` This is not indicated in the Offense Report.

"   During his interview Deputy Holley advised when he did open the door, `he seemed to take this as an invitation to exit the vehicle.` Deputy Holley advised he was not going to allow this to happen. Deputy Holley states, `so he starts to come out of the vehicle, he started to push him back into the vehicle.` He then states `he struggled against me, and kept continuously trying to exit the car.` This is not indicated in the Offense Report.

"   During his interview I ask if Bryant was attempting to `kick the windows out of the unit.` Deputy Silvas indicated he did not. He replied, `he was kicking the cage.` He further indicated it is so confining in that unit there is no way to lift up the legs high enough to kick the windows. He again advised he does remember him kicking the cage. Deputy Silvas did not indicate this occurring.

"   I ask if Bryant was `banging his head against anything.` Deputy Silvas indicated he did not. Deputy Holley replied, `he does not know because he was positioned directly behind him.`

"   I ask if Bryant was yelling out there was some type of emergency, they needed to stop, etc. Deputy Holley stated, `no sir.`

"   I ask if he was attempting to injure himself in any way. Deputy Silvas indicated he did not. He replied, `he can`t speak to it.` He again advised he was positioned directly behind him and he did not have a direct view of what he was doing.

"   During his interview I ask, `going back and in retrospect, was it necessary to open up that patrol car door.` Deputy Holley stated, `absolutely not, no.` He added, `what we should have done was just keep driving, and endure and ignore is what should have happened, that was an error in judgement on his part to think that he should talk to this guy, they should have just kept going.`

"   During his interview, Deputy Silvas indicated there was no reason to stop the patrol car.

"   In this situation where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control. Physical force `was not at all justified.` Bryant was not a threat, he was not damaging the unit, he was not injuring himself, he was only yelling at the deputies. The fact that Deputy Holley had

trainee Deputy Silvas stop the patrol unit and go back and open the door to an already combative arrestee, clearly backfired on Deputy Holley who states, he wanted to talk to him `face to face`.

"   Had Deputy Holley not have unjustifiably opened up the patrol door where a clearly combative and belligerent subject was located who was not threat to anyone or himself, THIS INCIDENT WOULD NOT HAVE OCCURRED AT ALL.  Therefore, Deputy Holley was unjustified in using physical force against Stephen Holley.

"   In all cases, officer shall follow and objectionably reasonable standard.  Objectionably reasonable in determining the necessity of force and the appropriate level of force, officer shall evaluate each situation in light of known circumstances, including, but not limited to the seriousness of the crime, the level of threat, resistance, or aggression presented by the subject and the danger to the community.   Deputy Holley did not meet the objectionably reasonable standard in this case.

"   Deputy Holley did not adhere to this agency`s use of force policy, and therefore did not protect the well-being of the prisoner who he was in charge, and possibly violated his civil rights as it was unreasonable and unjustified in this given situation to open the door where a handcuffed arrested subject was allegedly agitated, belligerent, and combative, when simply driving him straight to the jail would have completely averted this situation, as he was not a threat to himself or anyone else.

ATTACHMENTS:

1 MEMORANDUM TO SHERIFF TROCHESSET REQUESTING CASE BE EXTENDED TO MARCH 8TH 2019

STEPHEN BRYANT -ADA INTAKE NOTES FROM JAMES HAUGH 12-15-18

PATROL RMS CASE REPORT    1800004732

EMAIL REQUESTS AND EXCHANGE WITH DAVID CHILDRESS OF WATCHGUARD VIDEO, WATCHGUARD FORENSICS REPORT

DEPUTY MARTIN SILVAS AUDIO INTERVIEW

EMAIL REQUEST FROM CAPTAIN KEELE FOR CASE UPDATE AND THE RESPONSE FROM CAPTAIN KEELE TO LT BALCHUNAS

GSCO POLICIES FOR COMPLAINT REVIEW, STANDARDS OF CONDUCT, USE OF FORCE, REPORTING USE OF FORCE, TRANSPORTATION OF PRISONERS

JAIL BOOKING REPORT AND BOOKING PHOTO OF STEPHEN BRYANT

DISPATCH EVENT REPORT LOG

NOTES

ADA JENNIFER OTT EMAIL REGARDING MEETING UP

IN YELLOW ENVELOPE
1.  DISPATCH AND PATROL COMMUNICATIONS AUDIO
2.  72 PHOTOS ON DVD DISC OF STEPHEN BRYANT, THE SCENE, AND GALVESTON COUNTY SHERIFF`S OFFICE