### Page 1

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       GALVESTON DIVISION
STEPHEN PATRICK      ) Civil Action No.: 3:20-cv-374
BRYANT III           ) (Jury Trial)
                     )
    V.               )
                     )
GALVESTON COUNTY,    )
TEXAS, et al.        )

**********************************************************
         ORAL DEPOSITION BY ZOOM VIDEO CONFERENCE OF
                        ZACH HOLLEY
                      NOVEMBER 4, 2021
**********************************************************




         ORAL DEPOSITION BY ZOOM VIDEO CONFERENCE OF
ZACH HOLLEY, duly sworn, produced as a witness at the
instance of the Plaintiff, STEPHEN PATRICK BRYANT, III,
was taken in the above styled and numbered cause on the
4th day of November, 2021, from 10:03 a.m. to
12:08 p.m., before Valerie B. Szyman, CSR, Certified
Shorthand Reporter in and for the State of Texas,
reported by machine shorthand, pursuant to the Texas
Rules of Civil Procedure and the provisions stated on
the record.
```

### Page 2

```
 1   A P P E A R A N C E S:
 2
     FOR THE PLAINTIFF:
 3
         Mr. Randall L. Kallinen
 4       Kallinen Law PLLC
         511 Broadway Street
 5       Houston, Texas  77012
         (713) 320-3785 - Telephone
 6       (713) 893-6737 - Fax
         attorneykallinen@aol.com
 7
 8   FOR THE DEFENDANT, GALVESTON COUNTY, TEXAS, et al.:
 9       Mr. Gregory B. Cagle
         Gregory Cagle Attorney at Law, PC
10       1602B State Street
         Houston, Texas  77007
11       (713) 489-4789 - Telephone
         Gcagle@tmpalawyer.com
12
         Ms. Melissa Palmer
13       Greer, Herz & Adams, LLP
         One Moody Plaza, 18th Floor
14       Galveston, Texas  77550
         (409) 797-3293 - Telephone
15       mpalmer@greerherz.com
16
     ALSO PRESENT:
17
         Mr. Stephen Bryant, III
```

### Page 3

```
 1                       INDEX
 2                                              PAGE
 3   Appearances................................ 2
 4   ZACH HOLLEY
 5       Examination by Mr. Kallinen.........  4
 6   Signature and Changes....................... 62
 7   Reporter's Certificate...................... 64

                       EXHIBITS

    NO.   DESCRIPTION                            PAGE

    1     Texas Commission on Law Enforcement    13
          Personal Status Report
    2     Incident Report                        28
    3     IAD report                             35
```

### Page 4

```
 1                       ZACH HOLLEY,
 2   having been first duly sworn, testified as follows:
 3                       EXAMINATION
 4   QUESTIONS BY MR. KALLINEN:
 5       Q.  Mr. Holley, my name is Randall Kallinen and I'm
 6   an attorney who represents Mr. Bryant in a case
 7   involving his injuries back on the night of around
 8   December 14th of 2018.  Do you understand that?
 9       A.  Yes.
10       Q.  And how would you like to be referred to in
11   this deposition?  As Mr. Holley or how would you like to
12   be referred?
13       A.  Corporal will be fine.
14       Q.  Corporal.  And where are you a corporal at?
15       A.  The Galveston County Sheriff's Office.
16       Q.  Okay, Corporal, have you had a chance to read
17   the lawsuit?
18       A.  I'm sorry, can you repeat that?
19       Q.  Have you had a chance to read the lawsuit?
20       A.  Yes.
21       Q.  Okay.  Now, you realize this -- this is sworn
22   testimony, and if you were to make a material
23   misrepresentation on purpose, that could be grounds for
24   perjury?
25       A.  Yes.
```

Page 5

1  Q. What was your first year -- well, let's back
2  up.
3     Where did you go to high school?
4  A. Clear Creek High School.
5  Q. And what year did you graduate?
6  A. 2006.
7  Q. And what did you do after you graduated from
8  Clear Creek High School in 2006?
9  A. I went to college.
10 Q. Which college?
11 A. I started at Texas A&M - Kingsville and then
12 finished at Sam Houston State University.
13 Q. And what was your field of study at Texas A&M?
14 A. Criminology.
15 Q. And what was your field of study at Sam Houston
16 State University?
17 A. Criminal justice.
18 Q. And have you got a degree in criminal justice?
19 A. Yes, sir.
20 Q. Bachelor's degree?
21 A. Yes, sir. Bachelor of Science.
22 Q. In what year?
23 A. 2011.
24 Q. And what was your first law enforcement job?
25 A. Started as a reserve patrolman at the Clear

Page 6

1  Lake Shores Police Department.
2  Q. What year was that?
3  A. 2012.
4  Q. And how long were you in that position?
5  A. I -- I worked at -- there for six months as a
6  reserve before transitioning to a full-time officer and
7  then was promoted to a corporal shortly before I left
8  that agency.
9  Q. So you were a corporal when you left. And when
10 did you leave?
11 A. 2015.
12 Q. And where did you go then in 2015?
13 A. To the Santa Fe Police Department.
14 Q. And what were your duties at the Santa Fe
15 Police Department?
16 A. I was a patrol officer.
17 Q. And how long were you at the Santa Fe Police
18 Department?
19 A. Just under a year.
20 Q. So you left in 2016?
21 A. Yes, sir.
22 Q. And what did you do in 2016?
23 A. Went to the Jacinto City Police Department.
24 Q. And what were your duties there?
25 A. Patrol officer.

Page 7

1  Q. And then what did you do after that?
2  A. Came to the Galveston County Sheriff's Office.
3  Q. In which year?
4  A. 2017.
5  Q. And what was your duties in 2017?
6  A. Came on as a patrol deputy.
7  Q. Are you currently a patrol deputy?
8  A. Yes, sir.
9  Q. Have you ever been anything but a patrol deputy
10 at the Galveston County Sheriff's Office?
11 A. I was promoted to the patrol corporal which --
12 I was just a deputy but patrol corporal in January of
13 2020.
14 Q. Okay. But you've always been in the patrol
15 division?
16 A. Correct.
17 Q. Okay. Have you ever been arrested for a crime?
18 A. No.
19 Q. Have you ever been convicted of a crime?
20 A. No.
21 Q. While at any of these police agencies which you
22 have just told me about -- Clear Lake Shores, Santa Fe,
23 Jacinto City -- any of those three, was there ever any
24 discipline meted out in any fashion, no matter how
25 small, in any of those three agencies?

Page 8

1  A. Yes.
2  Q. Which particular one? Let's start with Clear
3  Lake Shores. What happened over at Clear Lake Shores?
4  Anything?
5  A. I honestly don't remember the specifics or
6  details, but, yes, I received discipline while I was
7  there.
8  Q. Was it for anything to do with excessive force?
9  A. Not to my recollection.
10 Q. It may have been but you don't recollect?
11 A. I don't recollect it being about the use of
12 force.
13 Q. And do you recollect anything about when you
14 were you were disciplined at the Santa Fe Police
15 Department? Anything at all?
16 A. Yes.
17 Q. What do you recollect?
18 A. I conducted a traffic stop on a person for a
19 defective third brake light which my agency took issue
20 with.
21 Q. Oh, did they say that, you know, that's
22 something that you shouldn't be stopping people for or
23 that's not a crime? What was the -- what was the
24 complaint, the substance of it?
25 A. They erroneously believed that you needed to

Page 9

1  have two taillights and, in fact, you need three but
2  they didn't capitulate.
3      Q. Okay. So was it their opinion basically that
4  you shouldn't have made that traffic stop?
5      A. Yes.
6      Q. Okay. Anything else in Santa Fe?
7      A. No.
8      Q. Okay. How about at Jacinto City 2016 or
9  whenever you were there, were you the subject of any
10 discipline at Jacinto City?
11     A. No.
12     Q. And then why did you leave Jacinto City?
13     A. Because I got a job at the sheriff's office.
14     Q. Okay. And why did you leave Santa Fe?
15     A. They terminated me.
16     Q. Okay. Now, this thing about the traffic stop,
17 did that happen in Santa Fe? My memory is already
18 fading me.
19     A. Yes, sir. It did.
20     Q. Okay. Anything happen over at Clear Lake
21 Shores?
22     A. As far as?
23     Q. Any discipline?
24     A. Yes. But I don't recollect the specifics.
25     Q. Okay. That one you don't recollect but there

Page 10

1  was something?
2      A. Yes.
3      Q. Okay. And the Santa Fe Police Department
4  terminated your position?
5      A. Yes, sir.
6      Q. And was that over this traffic stop or was it
7  something else?
8      A. Officially it wasn't but I think it was.
9      Q. Okay. What was the official reason that they
10 gave you?
11     A. Failure to successfully complete the standards
12 of a probationary policeman.
13     Q. Okay. While at the Galveston County Sheriff's
14 Office have you ever been the subject of any discipline?
15     A. Yes.
16     Q. And tell me about those, the first one you can
17 remember.
18     A. First one I can remember was conduct towards
19 the public.
20     Q. And what year was that?
21     A. I don't recall.
22     Q. And do you recall what that was about
23 generally?
24     A. That I used foul language while speaking with
25 someone.

Page 11

1      Q. And that -- and that was a sustained
2  disciplinary action?
3      A. Yes.
4      Q. And what was your punishment?
5      A. I think it was a day off. Suspension.
6      Q. Day off. With or without pay? Do you recall?
7      A. Without.
8      Q. And what -- and do you recall what year that
9  was?
10     A. No, I do not.
11     Q. Tell me about the second one you remember
12 discipline at the Galveston County Sheriff's Office.
13     A. Was as a result of the incident that brought us
14 here today.
15     Q. And so tell me the -- although I have a piece
16 of paper here that says, you know, says something about
17 it. To your recollection, what were the sustained
18 findings?
19     A. Conduct towards the public, failure to report
20 use of force, and violation of the nondeadly use of
21 force policy.
22     Q. And did you -- was there any appeal of those
23 issues to any agency after you got them or...
24     A. No.
25     Q. So those are still what's on your record today?

Page 12

1      A. As far as I know.
2      Q. Okay. So besides those two that you just
3  mentioned, any others?
4      A. No.
5      Q. At the Galveston?
6         Now, let me ask you about accusations. Did
7  anybody ever file a -- besides Stephen Bryant, has
8  anybody ever filed any complaint in any of these
9  agencies that we've just talked about, all of them,
10 regarding use of force?
11     A. Not to my knowledge.
12     Q. Okay. Maybe, but not to your knowledge that
13 you remember?
14     A. Correct.
15     Q. Okay. Where did you go to police academy?
16     A. Alvin Community College.
17     Q. What year?
18     A. 2011. I'm sorry. I'm sorry. 2012.
19     Q. And did you receive your peace officer's
20 license in 2012?
21     A. Yes, sir.
22     Q. Corporal, I am -- I have put up here on the
23 screen something I received in this litigation. Can you
24 see this Texas Commission on Law Enforcement Personal
25 Status Report?

Page 13

1   A. Yes.
2   Q. Okay. And have you ever seen this before?
3   A. Yes.
4   Q. Oh, by the why, what did you review prior to
5   your deposition?
6   A. The Internal Affairs report.
7   Q. And did you give a copy to your lawyer?
8   A. Yes.
9       MR. KALLINEN: Hey, Greg, do you have that
10  -- Greg, do you have a copy of that report handy that
11  you could e-mail me? Because I'm looking here and for
12  some reason, I don't see it. Could you send that to me,
13  please?
14      MR. CAGLE: I can.
15      MR. KALLINEN: Great. And you got -- yeah,
16  you got my e-mail address. So I'll look at it later.
17  But if you can send that to me, there might be a few
18  questions in there I might want to ask.
19      MR. CAGLE: Okay.
20      MR. KALLINEN: I don't know why I don't
21  have it. Maybe -- could be my fault. Somebody's -- I
22  don't know whose fault it is.
23      (HOLLEY Exhibit No. 1 was marked.)
24  Q. (By Mr. Kallinen) So getting back to what's
25  going to be Exhibit No. 1 to this deposition, the Texas

Page 14

1   Commission on Law Enforcement Personal Status Report,
2   let me just scroll through this, and then at the end I'm
3   going to ask you if this appears to be, you know, an
4   accurate depiction of your report.
5       If you want me to slow it down, just let me
6   know, but this is what I received from -- in this case
7   from the defendants. Okay. (Mr. Kallinen scrolls
8   through document.) We're about halfway through so just
9   bear with me.
10      Okay. Does Exhibit 1 look like a true and
11  correct copy of the records from the Texas Commission on
12  Law Enforcement regarding your license?
13  A. As of April, yes.
14  Q. Okay. Do you think there's anything more since
15  April?
16  A. Beyond -- no. Other than I've taken defensive
17  training courses since then, but otherwise --
18  Q. You've taken a few more courses since then.
19  What courses have you taken since then?
20  A. I would have to look them up.
21  Q. You can just tell me just generally. I really
22  don't care if it's that accurate.
23  A. You scroll down two pages.
24  Q. Sure.
25  A. No. Back to the top.

Page 15

1   Q. Oh, at the top. Oh, sorry.
2   A. Right.
3   Q. These go by most recent. I got ya.
4   A. Yes. Yes. Right there.
5   Q. Okay. Right there. Yeah. The last one here
6   -- so, yeah, that's the last one right there.
7   A. Firearms instructor. I've taken firearms
8   instructor since. And, I'm sorry, intoxilyzer refresher
9   and I think one other. I can't remember.
10  Q. Okay. Now, I just wanted to go through a few
11  of these -- these courses here that you've taken and
12  these licensing. So is this an accurate depiction of
13  your -- of your license progression?
14  A. Yes, sir.
15  Q. Okay. Excuse me. And do you recall -- sorry
16  -- approximately when you -- when this incident happened
17  that we're -- we filed a lawsuit about? Do you recall
18  what date it was?
19  A. December of 2018 maybe.
20  Q. Okay. Yeah. Let's just -- I need to refresh
21  my mind as well because I usually put it on the
22  paperwork here. Let me just look here really quickly.
23  Quickly, where is it. ID. Okay. 12-14-2018. Correct?
24  A. Yes.
25  Q. Okay. So you were an advanced peace officer

Page 16

1   about nine months before the incident with Mr. Bryant.
2   Correctly? Correct?
3   A. Yes.
4   Q. Now, let's look up here for a peace officer
5   license. In the academy were you -- were you taught
6   about what the constitutional limits of use of force was
7   in dealing with suspects?
8   A. Yes.
9   Q. Okay. And when you were a basic -- when you
10  got this basic peace officer license, did that require
11  some education on the constitutional limits of use of
12  force with suspects?
13  A. Yes.
14  Q. And looking at intermediate peace officer which
15  you obtained, looks like, on the 12th of December of
16  2015, did that also include learning about the
17  constitutional limits of use of force upon suspects?
18  A. Yes.
19  Q. This academic recognition award, what's that
20  about? Why did you get that?
21  A. When or why?
22  Q. Yeah. Why. Go ahead.
23  A. It's awarded to peace officers who have
24  obtained a higher learning degree after two years of
25  peace officer's service.

Page 17

1   Q. Okay. You mean is that because you've taken
2   like more courses than most officers? Is that why?
3   A. No. It's because I have a bachelor's degree.
4   Q. Okay. And when you obtained your bachelor's
5   degree at the two universities that you went to, did you
6   also learn about the constitutional limit of use of
7   force on suspects?
8   A. No.
9   Q. Really? They didn't teach you anything about
10  the constitutional use of force in your whole four
11  years? Really?
12  A. No. They weren't training us to use force.
13  Q. Oh, not training. I -- just like the
14  constitutional limits, like laws and case law and stuff
15  like that?
16  A. I -- yes. I received constitutional law
17  education.
18  Q. Okay. Including the constitutional limits on
19  use of force on a suspect. Correct?
20  A. No.
21  Q. No? Okay.
22      Now, I see here that the next one says
23  basic instructor proficiency. So are you -- when did
24  you become -- are you an instructor or have you been an
25  instructor?

Page 18

1   A. Yes.
2   Q. And who are you instructing?
3   A. Other policemen.
4   Q. Okay. At the Galveston County Sheriff's
5   Office?
6   A. Among others, yes.
7   Q. And how about the other agencies? What other
8   agencies have you been instructing at?
9   A. Any -- any officer from any agency that signs
10  up to take a course that I instruct.
11  Q. Okay. Now, is that your own -- when you --
12  when that's done, which agency is paying you when you do
13  that?
14  A. Typically the Galveston County Sheriff's
15  Office.
16  Q. So the Galveston County Sheriff's Office will
17  pay you even though you're instructing officers from
18  different agencies?
19  A. Correct.
20  Q. Now, about how many years have you been
21  instructing?
22  A. Since 2018.
23  Q. Okay. And is it like neighboring jurisdictions
24  like Santa Fe Police and, you know, Galveston Police?
25  A. Yes.

Page 19

1   Q. Texas City Police?
2   A. Yes.
3   Q. Okay. Now, do you have a certain specialty in
4   your instruction or is it just broadly any subject on
5   law enforcement?
6   A. Any subject that I'm qualified as a subject
7   matter expert to teach.
8   Q. Are you qualified on use of force?
9   A. No. Well, yes. But...
10  Q. Okay. You are qualified?
11  A. Yes.
12  Q. Have you instructed anybody on use of force?
13  A. No.
14  Q. Okay. Okay. Now, in 2018 you -- oh, excuse
15  me. Is there a special -- is there a special training,
16  special classes you've got take through TCOLE in order
17  to get that basic instructor proficiency rating?
18  A. Yes. The basic instructor course.
19  Q. During the basic instructor course are -- was
20  there any education on the constitutional limits of use
21  of force on suspects?
22  A. No.
23  Q. Now, we see here that you have attained
24  advanced peace officer in 2018. Now, to get that --
25  that level, did you also receive additional study in

Page 20

1   constitutional use of force on suspects?
2   A. No.
3   Q. Okay. And I see that you received another
4   academic recognition award. Why did you get that second
5   one?
6   A. The uniform pen that they send you when you
7   receive it, mine broke and so I had to pay another $30
8   and receive a replacement pen. And I guess they report
9   it twice when you do that.
10  Q. Well, it makes your record look better.
11  A. I like to think so.
12  Q. You should order a couple more pens, get four
13  of them on there.
14      So I know that there's another level called
15  the master peace officer. Are you working on that?
16  A. Yes. I will receive it in March of this next
17  year.
18  Q. Okay. So to get that master from the advanced,
19  were you taught anymore or learned anymore about the
20  constitutional limits of use of force on suspects?
21  A. No.
22  Q. I just want to go through a few of the classes
23  that you have taken. I see that on 1-26-21 you had a
24  body worn camera class. Correct?
25  A. Yes.

Page 21

1    Q. When did the Galveston County Sheriff Office
2  require -- start requiring their deputies to wear body
3  worn cameras?
4    A. It was either March and April or May of this
5  year.
6    Q. So prior to that there was no requirement?
7    A. Correct.
8    Q. And is that one of the reasons that you took
9  this body worn camera course is because the Galveston
10 County Sheriff's Office was going to have this policy so
11 they wanted you to take that?
12   A. Yes. I am charged with instructing the rest of
13 the agency with that same course.
14   Q. Okay. And the current Galveston County
15 Sheriff's policy on body worn cameras, does that include
16 that anytime there is interaction with the public that
17 you turn it on?
18   A. Yes.
19   Q. And could you just briefly tell me what are the
20 requirements for turning on your body camera? When
21 should it be on and when can it be off?
22   A. It -- by policy it's supposed to be on anytime
23 you're undertaking an enforcement role with any member
24 of the public or if a nonenforcement role, the
25 atmosphere of it tends to gravitate towards sort of --

Page 22

1  some sort of seriousness or, you know, if it's moving
2  towards an enforcement event, you would turn it on.
3    Q. Okay. So let's just say you saw somebody
4  suspicious, you know, just suspicious, maybe it's late
5  at night, 2:00 o'clock in the morning, and somebody is
6  walking on the street without a dog or anything, and you
7  just might ask them, Hey, you know, what's going on? Do
8  you have to turn them on then?
9    A. No.
10   Q. Okay. But let's say you notice that they're
11 intoxicated, then would you have to turn it on?
12   A. Yes.
13   Q. Okay. So basically once you gain some
14 suspicion of the occurrence of a crime, you would turn
15 it on?
16   A. Yes.
17   Q. I noticed that on -- in this Exhibit 1, we have
18 on page number 5 that you took a course in use of force,
19 intermediate, on 7-19-2014. Correct?
20   A. Yes.
21   Q. And that included the constitutional limits of
22 use of force on suspects. Correct?
23   A. Yes.
24   Q. How about this arrest search and seizure that
25 you also took in 2014, would that include the

Page 23

1  constitutional limits on use of force on suspects?
2    A. Probably.
3    Q. Okay. What is this 2013 field training
4  officer? What's that?
5    A. It's the field training officer certification.
6    Q. Okay. To get that field training
7  certification, did you have to learn the constitutional
8  limits of use of force?
9    A. No.
10   Q. Okay. I also see here quite often these
11 legislative updates. Do you see that?
12   A. Yes, sir.
13   Q. What is that about?
14   A. It's a required course that TCOLE mandates we
15 take every training cycle.
16   Q. And how long is a training cycle?
17   A. Two years.
18   Q. So every two years you do have to take the
19 legislative session legal update. Correct?
20   A. Yes.
21   Q. And oftentimes that would include cases on the
22 constitutional limits of use of force. Correct?
23   A. Yes.
24   Q. And would that include cases on qualified
25 immunity?

Page 24

1    A. Yes.
2    Q. Such as when -- when is a police officer --
3  when -- strike that last question.
4        And this course here -- well, I guess it's,
5  you know, more than just a course. It's the basic peace
6  officer -- it's a whole bunch of courses. Right?
7    A. Correct.
8    Q. Yeah. And that's where you learned a lot about
9  the constitutional limits on the use of force on
10 suspects. Correct?
11   A. Yes.
12   Q. So on December 14th of 2018, you had a lot of
13 education and training on the constitutional use of
14 force on suspects. Correct?
15       MR. CAGLE: Objection, form. You can
16 answer.
17   A. I don't know if I would say a lot but I've had
18 some.
19   Q. (By Mr. Kallinen) Are you required to report
20 any discipline in area findings by any law enforcement
21 agency to TCOLE?
22   A. I am not.
23   Q. Is the agency supposed to?
24   A. I don't know.
25   Q. Now, prior to your Clear Lake Shores job or

Page 25

1  right at the beginning, did you have to take a -- did
2  you have to swear to uphold the constitution of the
3  United States?
4      A. Yes.
5      Q. Before you got your job or as you got your job
6  at the Santa Fe Police Department, did you have to swear
7  to uphold the Constitution of the United States?
8      A. Yes.
9      Q. When you got your San Jacinto job, did you have
10 to swear that you would uphold the Constitution of the
11 United States?
12     A. Yes.
13     Q. When you got your Galveston County Sheriff's
14 Office job, did you have to swear that you would uphold
15 the Constitution of the United States?
16     A. Yes.
17     Q. And you do realize that under the unreasonable
18 search and seizure clause that would include the
19 constitutional limits on excessive force. Correct?
20     A. No.
21     Q. You don't know that under the Fourth Amendment
22 there are constitutional limits on the use of force by
23 police officers?
24         MR. CAGLE: Yes.
25     A. Yes. I'm aware that there are limits.

Page 26

1      Q. (By Mr. Kallinen) Yeah. Oh, by the way, I
2  usually ask this, but is there anyone -- are you by
3  yourself right now?
4      A. No. I'm with my counsel.
5      Q. Oh, you mean Mr. Cagle?
6      A. Yes, sir.
7      Q. Okay. Anybody else in the room?
8      A. No, sir.
9      Q. And where are you physically located?
10     A. Galveston County.
11     Q. At Greg Cagle's office?
12     A. No, sir.
13     Q. Oh, which you're -- particular administrative
14 building you at?
15     A. At the Bacliff substation of the Galveston
16 County Sheriff's Office.
17     Q. Okay. What documents did you go over prior to
18 your deposition?
19     A. The Internal Affairs report.
20     Q. Anything else?
21     A. No, sir.
22     Q. Were you equipped with a body worn camera on
23 the day of the incident?
24     A. No.
25     Q. Were you the driver of the vehicle on the day

Page 27

1  of the incident?
2      A. No.
3      Q. Who was the driver of the vehicle?
4      A. Deputy Silvas.
5      Q. But you -- y'all were driving together?
6      A. Yes.
7      Q. Does Galveston County always have two officers
8  in the vehicle or usually one officer in the vehicle?
9  What's the most common?
10     A. One officer.
11     Q. How come there was two officers that day?
12     A. Deputy Silvas was in field training.
13     Q. So basically this was Deputy Silvas's first
14 year?
15     A. Yes.
16     Q. And you were his field trainer?
17     A. Yes.
18     Q. As a part of the field training, are you
19 supposed to train officers on the constitutional limits
20 of use of force?
21     A. No.
22     Q. Okay. Do you -- as part of your field
23 training, do you have to -- well, let me ask you this
24 question: Is there a policy of Galveston County
25 Sheriff's Office on the day of the incident, was there

Page 28

1  one in effect where if a deputy saw a policy violation,
2  he's supposed to report it?
3      A. I believe so.
4      Q. Now, as a part of your field training, do you
5  remind or tell the trainees that they're required to
6  report violations of the Galveston County Sheriff's
7  policies?
8      A. No.
9          (HOLLEY Exhibit No. 2 was marked.)
10     Q. (By Mr. Kallinen) Corporal, I'm putting up
11 here on the screen what is going to be Exhibit No. 2 to
12 the deposition. And it is -- I think this is the
13 incident report of the case. Okay. There it is.
14         Did you get a chance to review this prior
15 to your deposition, the incident report of this
16 particular case?
17     A. Yes.
18     Q. And were you the author of the incident report
19 in Exhibit No. 2?
20     A. No.
21     Q. Who was the author?
22     A. Deputy Silvas.
23     Q. Did you do any supplements to this one? I'll
24 scroll down because usually supplements are at the end.
25 Right?

Page 29

1    A. Correct.
2    Q. Okay. So this is what Deputy Silvas is saying.
3 It says by Deputy Silvas. Do you ever -- I don't see a
4 supplement here in this exhibit. Did you?
5    A. No, sir.
6    Q. Do you know if you ever did do a supplement to
7 the -- the incident or investigation report?
8    A. I did not.
9    Q. Okay. To your knowledge did anybody other than
10 Silvas author anything in the completed incident
11 investigation report?
12   A. No.
13   Q. Okay. And, now, looking at this report, you
14 were called out on an assault, not aggravated charge.
15 Is that correct?
16   A. I was called out for a disturbance. Yes.
17   Q. A disturbance. And when -- who called you out
18 to the disturbance?
19   A. I don't recall.
20   Q. Was it the dispatcher or...
21   A. I was dispatched by a dispatcher, yes.
22   Q. Okay. So you never spoke directly to the
23 complainant, did you, prior to -- prior to arriving at
24 the scene?
25   A. No.

Page 30

1    Q. Okay. So the dispatcher said there was a
2 disturbance, gave you the address, and you went out to
3 ███████████████████████ Correct?
4    A. Correct.
5    Q. Now, looking at page number -- it looks like
6 page number 3 of the report, I have up on the screen, it
7 says the assisting officers were Bell, Silvas, Allen,
8 Ostermayer, and Holley. So all those five deputies were
9 out at the scene?
10   A. I don't recall.
11   Q. But you recall Silvas was there of course. Do
12 you recall any -- any of these officers being out there?
13   A. Other than Silvas and myself, that's all I
14 recall.
15   Q. Okay. And the synopsis here, we see that this
16 was regarding a physical disturbance which occurred, and
17 there was one individual arrested for assault and
18 evading arrest or detention. You see that?
19   A. Yes, I do.
20   Q. Do you know whatever became of those charges of
21 arrest or evading arrest or detention?
22   A. I do not.
23   Q. Now, we're talking about Stephen, excuse me,
24 Stephen Patrick Bryant. Correct?
25   A. Sure.

Page 31

1    Q. I just want to be sure. Trying to find it
2 listed here. Okay. Where are you? I see there is a
3 victim listed but --
4    A. Go to the last page.
5    Q. Last page? Okay. So yeah. Stephen Patrick
6 Bryant, III, was the individual arrested. Correct?
7    A. Yes.
8    Q. Now, you never talked to -- I'm noticing here
9 it says on the first page that it says something about a
10 friend of the alleged victim was the caller. You never
11 talked to that friend, did you?
12       MR. CAGLE: Objection, form. You can
13 answer.
14   A. No.
15   Q. (By Mr. Kallinen) Okay. When you were out
16 there, did you -- did you talk to anybody other than
17 Mr. Bryant and Kristen Bryant? Did you talk to anybody
18 else?
19   A. Not to my recollection.
20   Q. Okay. I'm looking at this report and
21 Mr. Silvas, Officer Silvas, reports near the end, he
22 says, A copy of the in-car video from unit 3642 was
23 later submitted to the secure WatchGuard Evidence
24 Library.
25       Have you ever seen that video?

Page 32

1    A. I'm sure I have at some point.
2    Q. Now, would that be the video of the backseat?
3    A. It would include the backseat.
4    Q. Okay. So you know in this lawsuit that
5 Mr. Bryant alleges that he was in the backseat when he
6 was assaulted basically by you. That's his accusation.
7 You realize that. Right?
8    A. Yes.
9    Q. Okay. So -- and where he's alleging this
10 occurred, that would be an area covered by the in-car
11 video recording. Correct?
12   A. Correct.
13   Q. And when did you view the in-car video
14 recording in this case?
15   A. I don't recall.
16       MR. KALLINEN: Hey, Greg?
17       MR. CAGLE: Yeah.
18       MR. KALLINEN: Do you have a copy of the
19 in-car video recording?
20       MR. CAGLE: No, sir.
21       MR. KALLINEN: Hmm. Do you know if --
22 okay.
23       Ms. Palmer? I forget -- I forget who you
24 represent. Ms. Palmer? You've got your -- you're
25 muted.

Page 33

1  MS. PALMER: I -- no. I was about to take
2  it off of mute. I represent Galveston County.
3  MR. KALLINEN: Do you have a copy of that
4  in-car video recording?
5  MS. PALMER: We have some video but I don't
6  think it's a -- I think it stops before they leave the
7  scene or as they leave the scene.
8  MR. KALLINEN: Okay.
9  MS. PALMER: I don't think there's ever --
10 in the car but there's some -- like maybe it's in the
11 cars but you don't see in the car. The camera is in the
12 car but you don't see in the car.
13 MR. KALLINEN: Yeah.
14 MS. PALMER: If that makes sense?
15 MR. KALLINEN: Yeah.
16 MS. PALMER: Maybe you see outside or
17 something.
18 MR. KALLINEN: What's that?
19 MS. PALMER: You see outside of the front
20 of the car.
21 MR. KALLINEN: Okay. Now --
22 MS. PALMER: But for this specific time
23 period, there's no video.
24 MR. KALLINEN: Okay. You know what, I was
25 looking through my records prior to the deposition, and

Page 34

1  I didn't happen to see that video, not that -- I mean,
2  there's many reasons why I might not have it, but --
3  MS. PALMER: Do you want me to see what --
4  I can see what I can find and forward you what I've got.
5  MR. KALLINEN: Yeah. Please do that
6  because I don't want to have to attempt to restart this
7  deposition. So...
8  MS. PALMER: Okay.
9  MR. KALLINEN: Yeah.
10 MS. PALMER: Give me just a few minutes.
11 My other computer is updating or something.
12 MR. KALLINEN: Great.
13 MS. PALMER: But as soon as it pulls up, I
14 will see if I can pull it up. I will try it with this
15 computer. I don't know what it will do to this meeting.
16 If I leave it, I will rejoin.
17 MR. KALLINEN: All righty. Well, I truly
18 appreciate it. And I'll just keep on questioning then.
19 If you want to mute yourself, Ms. Palmer.
20 MS. PALMER: I'm sorry.
21 Q. (By Mr. Kallinen) Now, Corporal, what -- at
22 the time of this incident, what was the policy on
23 running the in-car video?
24 A. There wasn't one.
25 Q. Was there any policy regarding running the dash

Page 35

1  cam?
2  A. No.
3  Q. It was just totally left up to officer's
4  discretion?
5  A. There was no policy.
6  Q. Do you recall if the in-car video camera was
7  running when Stephen Patrick Bryant was in the back
8  seat?
9  A. I do not recall.
10 (HOLLEY Exhibit No. 3 was marked.)
11 Q. (By Mr. Kallinen) Okay. Corporal, I have put
12 up on the screen Exhibit No. 3 which is the IAD report.
13 And I'll just scroll through it rather quickly because
14 it's rather long. And I just want you to tell me is
15 this the report that you're talking about that you read
16 prior -- that you reviewed prior to this deposition.
17 So let me just go through it rather quickly
18 because it was like 169 pages. (Mr. Kallinen scrolls
19 through the document.) I'm getting near the end. So
20 does that look like -- does Exhibit 3 look like a true
21 and correct copy of the IAD report that you reviewed?
22 A. Yes.
23 Q. Do you know if around the time of the alleged
24 assault of Stephen Patrick Bryant whether there was any
25 repair order regarding the in-camera -- the in-car

Page 36

1  video?
2  A. No.
3  Q. Did you touch the in-car camera video on the
4  day of the incident?
5  A. I don't -- I don't know.
6  Q. Okay. Do you think you might have bumped it?
7  A. I don't know.
8  Q. Have you ever testified in a court --
9  courtroom?
10 A. Yes.
11 Q. How many times have you testified in a court
12 regarding Class C or traffic violations?
13 A. I don't know.
14 Q. Is it more than one?
15 A. Yes.
16 Q. Is it closer to 10 or closer to 30?
17 A. I -- probably closer to 30.
18 Q. Okay. How about in misdemeanor criminal court,
19 have you ever testified in misdemeanor criminal court?
20 A. Yes.
21 Q. Closer to 10 or closer to 30?
22 A. Probably closer to 30.
23 Q. How about in felony district court, have you
24 ever testified in felony district court?
25 A. Yes.

Page 37

1  Q. Closer to 10 or closer to 30?
2  A. Closer to 10.
3  Q. Less than 10 or more than 10?
4  A. I honestly don't know.
5  Q. Have you ever given your deposition before?
6  A. No.
7  Q. Have you ever been sued before?
8  A. No.
9  Q. Have you ever sued anybody before?
10 A. No.
11 Q. Now, I'm looking here at the Exhibit No. --
12 Exhibit No. 3, the IAD report. And it mentions here
13 that Detective Enoch was able to pull up a video where
14 Bryant is seated in the holding area, I guess, of the
15 jail. However, the audio did not appear to be working.
16 Do you see that?
17 A. I see it.
18 Q. Have you ever seen that video?
19 A. No.
20 Q. Have you seen any video of Mr. Bryant on the
21 day of the incident at any place at all?
22 A. I'm sure I have at some point.
23 Q. And what would that video be?
24 A. The in-car video.
25 Q. Okay. And would that include the time in which

Page 38

1  he alleges he was injured?
2  A. No.
3  Q. And would it be before or after?
4  A. After. Or, I'm sorry. Can you clarify what
5  portion?
6  Q. In other words, you know in this lawsuit it's
7  alleged that as -- as -- basically, as he was being
8  taken from the scene, within just a few seconds that's
9  when the incident occurred. So based upon that, if
10 that's the accusation, then did you see the video of him
11 in the backseat before or after that?
12 A. I would -- I don't -- there would be no reason
13 to view the video before the video concluded so I guess
14 after.
15 Q. Oh, by the way, I can see both you and Greg
16 Cagle, and it looks like you looked over to Greg for a
17 response. So I would kindly ask you that you not look
18 to Greg for a response to shake his head or whatever.
19 Okay?
20 A. Sure.
21 Q. Okay. You've got to answer these with no input
22 from your lawyer.
23        Were you ever asked about possibly
24 disconnecting the video of the rear seat video in car in
25 relation to the IAD investigation?

Page 39

1  A. Yes.
2  Q. And what did you tell them?
3  A. That's impossible.
4  Q. So basically you said you didn't do it?
5  A. I said it was impossible. Yes, I didn't do it.
6  Q. Okay. Now, in all these many, many times that
7  you testified in criminal courts, these were all
8  basically -- you testified for the state to prosecute a
9  suspect, correct, or a defendant?
10        MR. CAGLE: Objection, form. You can
11 answer.
12 A. Yes.
13 Q. (By Mr. Kallinen) Okay. So in these cases,
14 were any of the -- was any of the evidence presented
15 videos of a crime occurring or a crime being admitted to
16 or anything like that?
17 A. Yes.
18 Q. Okay. Now, does it ever happen that when you
19 are talking with a suspect, you catch the suspect on
20 video saying something that helps in the prosecution?
21 A. Yes.
22 Q. Okay. So wouldn't it have been good to
23 videotape Mr. Bryant in the back seat in case he
24 admitted to something or said something that helped the
25 prosecution?

Page 40

1        MR. CAGLE: Objection, form. You can
2  answer.
3  A. Can you rephrase the question or repeat the
4  question?
5  Q. (By Mr. Kallinen) Well, if -- wouldn't it have
6  been helpful to have the video camera in the back seat
7  running in case Mr. Bryant admitted to the crime,
8  alleged crime, or he said something which helps in the
9  prosecution?
10 A. It would have been helpful.
11 Q. So why wasn't the video in the back running?
12 A. Because it was stopped prior to transport.
13 Q. Who did that?
14 A. Either I or Deputy Silvas. I don't recall.
15 Q. Well, why didn't you turn it back on when he
16 was in the back seat so he could, you know, maybe admit
17 to a crime?
18 A. Common practice that I did not record during
19 transport.
20 Q. Why?
21 A. Video space issues, time issues, staffing
22 issues. There's a plethora of reasons.
23 Q. Did Mr. Bryant say one single word in the back
24 seat?
25 A. Yes.

Page 41

1   Q. Okay. Well, why didn't you record that?
2   Because if he's talking in the back seat, couldn't it be
3   possible he would say something to help you with your
4   prosecution?
5   A. Yes, it could be possible.
6   Q. Did you give a written statement to IAD?
7   A. Did I give a written statement? No.
8   Q. Yes. Did you give an oral statement to IAD?
9   A. Yes.
10  Q. Was it recorded?
11  A. I believe so.
12  Q. Okay.
13       MR. KALLINEN: Hey, Greg, and once again, I
14  don't know what happened here, but do you have a copy of
15  that oral recording, audio recording, of whatever
16  statement he gave to the Internal Affairs Division?
17       MR. CAGLE: I sent you everything that I
18  had.
19       MR. KALLINEN: Okay. Do you know if
20  there's -- such a thing exists?
21       MR. CAGLE: My understanding is that it
22  exists. When -- yeah, I believe it exists.
23       MR. KALLINEN: Okay. Could you send that
24  to me? Again, I mean, if, you know, if you have it, I
25  would like to have it. I don't know why it wasn't in my

Page 42

1   file. Could be many reasons once again. But if you do
2   have it, could you kindly send it to me?
3        MR. CAGLE: I don't think I have it but
4   I'll look. But I think it's listed as an exhibit on the
5   -- this report document, on this packet thing.
6        MR. KALLINEN: Yeah, it is. Well, it says
7   something. I thought I saw something because I -- you
8   know, looking here, and I just want to be certain if you
9   have a copy of the audio, you know, recording of the IAD
10  investigation, that is something that of course I would
11  need because it would be relevant to this case.
12       MS. PALMER: Sir, there's a Drop Box file
13  that's been shared with you, and I'm trying to upload
14  the -- trying to figure out how to share that dashboard
15  video or whatever it is with you again. But for sure
16  that recorded statement is in that Drop Box video I'm
17  looking at. But I'm having trouble -- I don't know if
18  I'm going to be able to do it.
19       I may have to call the office to get them
20  to upload an FTP link for you, this other video, but for
21  sure in the Drop Box to -- let me re-share it with you.
22  And if you want to take a break, I can see if maybe I
23  can fix that and get that other video uploaded to it
24  too.
25       MR. KALLINEN: Yeah. You want to take a

Page 43

1   break now?
2        MS. PALMER: Well, it's up to you.
3        MR. KALLINEN: Yeah. Why don't we take a
4   break now.
5        MS. PALMER: I'm just thinking part of my
6   computer problem may be if I get off the Zoom for a few
7   minutes I can do it.
8        MR. KALLINEN: That would be fine. Court
9   reporter, can we get off the Zoom? Or do you have to
10  get of -- we don't have to get off the Zoom. But you
11  have to get off the Zoom, Ms. Palmer?
12       MS. PALMER: I think -- well, not to share
13  the Drop Box probably. I can do that. Hold on.
14       MR. KALLINEN: I tell you what, I need to
15  take a five- to ten-minute break anyway so why don't we
16  go ahead and take that break.
17       MS. PALMER: Okay.
18       MR. KALLINEN: Off the record for a while,
19  five, ten minutes?
20       MS. PALMER: Sounds good to me.
21       THE REPORTER: All right. Off the record.
22       (Recess from 11:10 a.m. to 11:39 a.m.)
23  Q. (By Mr. Kallinen) Now, we had talked about the
24  video recording -- I guess I'm going to see it here
25  pretty soon, but how does this system operate? How do

Page 44

1   you turn on the end car video? How is it turned on and
2   turned off?
3   A. There's a button for start and stop.
4   Q. Is that accessible to both the driver and the
5   passenger?
6   A. Yes.
7   Q. Front seat passenger?
8   A. Yes.
9   Q. Okay. And where on the vehicle is it exactly?
10  Like where?
11  A. It's on a small monitor mounted from the
12  headrest towards the passenger side.
13  Q. Okay. So it's -- actually would have been
14  closer to you because you were the passenger than
15  Silvas. Right?
16  A. Correct. It's oriented to the driver though.
17  Q. Okay. So it's like turned in his direction?
18  A. Correct.
19  Q. And you've turned those on and off in your
20  duties many, many times prior to this incident. Right?
21  A. Yes.
22  Q. Okay. So is it fair to say your position is
23  that the reason the in-car video which would have shown
24  Stephen Bryant in the back had been turned off by either
25  you or Silvas prior to him being in the back?

Page 45

1   A. No.
2   Q. Okay. So why wasn't it running?
3   A. Because it was common practice to stop the
4   video at the time prior to transport or during -- at the
5   beginning of transport.
6   Q. Is that written down in some policy -- policy
7   manual or something?
8   A. No.
9   Q. That's just like in-the-field training
10  so-to-speak?
11  A. No. It's just -- was just a common practice.
12  Q. Okay. So it was -- you're saying it was
13  running at sometime prior to the incident when -- like
14  when you were driving, but at some point it was turned
15  off by one of y'all?
16  A. No.
17  Q. No?
18  A. Not what I'm saying.
19  Q. Okay. Was the in-car video ever turned on at
20  any time after you got the call to go to the residence?
21  A. Yes.
22  Q. Okay. Then when did it stop recording and how
23  did it stop recording?
24  A. It would have been deactivated prior to
25  transport.

Page 46

1   Q. Who did that?
2   A. I don't know if it was me or Deputy Silvas.
3   Q. Now, did you -- have you seen the -- you've
4   seen the IAD report. And I'm looking at the IAD report,
5   and it says that Mr. Bryant's wife said she saw y'all
6   stop the vehicle shortly after you took off and that you
7   got into the back seat. Do you recall that?
8   A. Do I recall that -- what's the question?
9   Q. Do you recall getting in the back seat with
10  Mr. Bryant after you had actually taken off, you both
11  had taken off, and then stopped the vehicle and then you
12  got in the backseat with Mr. Bryant?
13  A. I did not get in the backseat with Mr. Bryant.
14  Q. So -- so why did -- to your knowledge why does
15  Kristen Bryant say that you did get in the backseat?
16      MR. CAGLE: Objection, form; speculation.
17  Q. (By Mr. Kallinen) Is Kristen Bryant a liar?
18  Oh, you -- quit looking at Mr. Cagle. Hey, you're
19  looking at Mr. Cagle. Don't do it.
20      MS. PALMER: Objection, form.
21  Q. (By Mr. Kallinen) Don't do it.
22      MR. CAGLE: Just answer his question.
23  A. Yes. I would say that she's a liar.
24  Q. (By Mr. Kallinen) Okay. Was she a liar when
25  she accused Stephen of some sort of assault? Was she a

Page 47

1   liar then?
2   A. I don't believe so.
3   Q. Okay. So at some point she turned into a liar?
4   A. It would be my guess.
5   Q. Does that vehicle have a black box?
6   A. Yes.
7   Q. Okay. Did anybody ever look at the information
8   on the black box to see when the vehicle was moving and
9   when the vehicle was not moving?
10  A. I don't know.
11  Q. That's one of the features of the black box.
12  It can say when a car is moving and when a car is not
13  moving. Correct?
14  A. Yes. I'm well aware.
15  Q. And also says things like speed, braking, when
16  the lights are -- when the overhead lights are on, stuff
17  like that. Right?
18  A. No.
19  Q. Not the overhead lights?
20  A. Not any of that.
21  Q. Okay. To your recollection what is featured on
22  the black box?
23  A. The black box will capture the data five
24  seconds to an airbag deployment within --
25  Q. To your knowledge that's the only thing it

Page 48

1   captures?
2   A. Yes.
3   Q. Do you recall what kind of vehicle that was
4   that you were driving?
5   A. Chevrolet --
6   Q. That Silvas was driving?
7   A. It's a Chevrolet Tahoe.
8   Q. What year?
9   A. I don't -- '16.
10  Q. Is that -- how long do your vehicles usually
11  stay in service over there? Five years? Ten years?
12  A. I believe they're rotated every three years.
13  Q. Okay. So your vehicles are never more than
14  three years old?
15  A. I don't know about never more, but I believe
16  the plan is to rotate them every three years.
17  Q. Now, looking here in the IAD report, it also
18  says that there's a policy that when possible, officers
19  shall consider using their MVR equipment to record, A,
20  the actions of suspects during interviews, when
21  undergoing sobriety checks, when placed in custody.
22      Do you agree with that that that is a
23  policy of the Galveston County Sheriff's Office at the
24  time of the incident?
25  A. Yes.

Page 49

1    Q. Okay.
2        MS. PALMER: Objection, form.
3    Q. (By Mr. Kallinen) But you will note in there
4  it says consider. Correct?
5    A. Yes.
6    Q. And so to you that means maybe you do; maybe
7  you don't. Right?
8    A. Sure.
9    Q. Okay. When you pulled up to the scene, which
10 direction was your squad car facing?
11   A. I don't recall.
12   Q. Did you get a chance to view the dash cam video
13 if there was one? You said there -- wait a second. You
14 said there was no dash cam video in this case. Right?
15   A. No, that's not what I said.
16   Q. Okay. There is a dash cam video in this case?
17   A. There should be, yes.
18   Q. Have you viewed it prior to this deposition?
19   A. No.
20   Q. Did you view it at any time after the incident?
21   A. At some point I did.
22   Q. Yeah. Now, on dash cam video, how is audio
23 recorded?
24   A. It's recorded through a wireless microphone
25 wore on the body of the deputy.

Page 50

1    Q. Now, is that the driver only or could it be
2  yourself as well?
3    A. There's only one microphone so only one of us
4  would be wearing it.
5    Q. Who was wearing it that day?
6    A. I don't recall.
7    Q. Does it make a difference if the driver or the
8  passenger is wearing it?
9    A. Typically whoever is going to be conducting the
10 investigation would be wearing it.
11   Q. So there's only -- and who was going to be
12 conducting the investigation?
13   A. Deputy Silvas.
14   Q. So he likely had the microphone then?
15   A. Likely.
16   Q. Uh-huh. And there's only one. There can't be
17 two or three?
18   A. There can be. We just don't have more than
19 one.
20   Q. Okay. Is there an audio so you can record the
21 person in the back seat making admissions or giving
22 other facts helpful to the prosecution?
23   A. There's a microphone placed alongside the rear
24 camera in the vehicle.
25   Q. Now, can the audio be regarded separate from

Page 51

1  the video?
2    A. No.
3    Q. Was there an audio in this case of Stephen
4  Bryant in the back seat?
5    A. I don't know.
6        MS. PALMER: Objection, form.
7    Q. (By Mr. Kallinen) Now, you said you never got
8  in the back seat with Mr. Bryant. Is that correct?
9    A. Correct.
10   Q. Did Silvas ever stop the car after you took
11 off?
12   A. Yes.
13   Q. When did he stop the car?
14   A. When I told him to.
15   Q. And how long was that after you had taken off
16 from the residence?
17   A. Seconds.
18   Q. And why did you tell Silvas to stop the car?
19   A. Because Mr. Bryant became very, very irate,
20 vulgar, and unruly.
21   Q. Yes. But none of that was captured on any
22 video to your knowledge?
23   A. To my knowledge, no.
24   Q. Okay. So did he -- did he insult you?
25   A. Absolutely.

Page 52

1    Q. What did he say?
2    A. I don't remember the specifics but it was a
3  volley of vulgarities.
4    Q. Okay. I see. But you can't recall any
5  specific word he said but you do recall it was
6  vulgarities?
7    A. According to the Internal Affairs report,
8  faggot, pig, things like that.
9    Q. Okay. And did you get angry at him and go
10 choke him in the back seat when he said those things?
11   A. Absolutely not.
12   Q. What did you do?
13   A. I instructed Deputy Silvas to stop the car so
14 that I could have a chat with Mr. Bryant because in his
15 current state, the Santa Fe Jail would not accept him.
16   Q. So all you have to do is start swearing and you
17 don't go to jail?
18   A. No. I don't know where you would have gotten
19 that.
20   Q. Well, what state are you talking about?
21   A. In his combativeness state, the Santa Fe Jail
22 would not have accepted my prisoner.
23   Q. So all I've got to do is be combative and I
24 don't go to jail?
25   A. No.

Page 53

1    Q. Don't you take combative people to the jail? I
2 mean, isn't that one of your functions, when people are
3 combative and violent you take them to jail?
4    A. All the time.
5    Q. Right. Well, why did you stop the car when
6 Mr. Bryant was displaying these character -- allegedly
7 displaying these characteristics?
8    A. Trying to avoid having to transport him to the
9 Galveston County Jail.
10    Q. So even though he was handcuffed in the back
11 seat and you were taking off, you weren't taking him to
12 the Galveston County Jail?
13    A. No.
14    Q. Where were you taking him?
15    A. Santa Fe Jail.
16    Q. Well, isn't it true that people are transported
17 from the Santa Fe Jail to the Galveston County Jail?
18 Isn't that correct?
19    A. Yes. People are transported from those two
20 jails.
21    Q. And so what proof do you have that you did not
22 intend to take Mr. Bryant to the Galveston County Jail
23 when y'all left his residence?
24    A. I don't -- what sort of proof would you like,
25 Counselor?

Page 54

1    Q. Any proof.
2    A. Okay. I don't know how I can prove an
3 intangible.
4    Q. So you have no proof that you didn't intend to
5 take him to jail when you left the -- his residence?
6        MS. PALMER: Objection, form. Misconstrues
7 prior testimony.
8    Q. (By Mr. Kallinen) You may answer. That's an
9 objection.
10    A. Okay. No, I have no proof to -- no way to
11 prove something that isn't physically real.
12    Q. Yeah. Now, you never accused Mr. Bryant of
13 punching you, did you, in the paperwork?
14    A. No.
15    Q. He didn't punch you, did he?
16    A. No.
17    Q. He didn't spit at you, did he?
18    A. No.
19    Q. He didn't kick you?
20    A. No.
21    Q. He didn't -- he didn't physically assault you
22 or Mr. Silvas in any way, did he?
23    A. No.
24    Q. But you do claim he said vulgarities to you.
25 Correct?

Page 55

1    A. Among -- among his other behavior, yes.
2    Q. Okay. Did he break anything in the squad car
3 that you reported?
4    A. I don't recall.
5    Q. Isn't it a crime to break things in the squad
6 car?
7    A. It is.
8    Q. But you never reported him for any crime like
9 that, did you?
10    A. I did not.
11    Q. Okay. So to your knowledge he never broke or
12 damaged any property of Galveston County, did he?
13    A. Not to my knowledge.
14    Q. Did -- did Mr. Bryant criticize your method of
15 policing?
16    A. I don't recall.
17    Q. During all of the events, did you follow all of
18 the policies of the Galveston County Sheriff's Office?
19    A. Yes.
20        MR. CAGLE: Objection, form.
21    A. Yes.
22    Q. (By Mr. Kallinen) So you did order Deputy
23 Silvas to stop the vehicle. Correct?
24    A. Yes.
25    Q. And you had that ability because you were the

Page 56

1 trainer and he was a probationary officer. Right?
2    A. Correct.
3    Q. So after you stopped the vehicle, what did you
4 do?
5    A. I got out of the vehicle and opened the --
6 door -- passenger door where Mr. Bryant was seated.
7    Q. Okay. So you did get out of the vehicle and
8 you did open the door?
9    A. I did.
10    Q. Okay. And then did you touch Mr. Stephen
11 Bryant in any manner?
12    A. Yes.
13    Q. What did you do?
14    A. Well, he took it as an invitation to try to
15 escape the vehicle so I prevented that.
16    Q. Was he in handcuffs?
17    A. Yes.
18    Q. Okay. How does a person escape the vehicle in
19 handcuffs when he's belted in?
20    A. He wasn't belted in but he also had --
21    Q. He was --
22    A. -- seemed to work.
23    Q. Isn't true that you just -- that both you and
24 Silvas violated Galveston County Sheriff's Office policy
25 by not belting in Stephen Bryant?

Page 57

1  A. I don't know if that's a policy of theirs or
2  not.
3         MS. PALMER: Objection, form.
4  Q. (By Mr. Kallinen) Okay. So -- but you're
5  saying that you did not belt in Stephen Bryant and
6  neither did Silvas. Correct?
7  A. Correct.
8  Q. All right. Well, if he's in handcuffs, if you
9  were to stop suddenly, wouldn't Mr. Bryant then go
10 forward in the seat and bang his head possibly?
11 A. Sure.
12 Q. So was -- so how often is it that you put
13 somebody in the back seat with handcuffs on and then you
14 don't belt them in? Is that a common practice over
15 there?
16        MS. PALMER: Objection, form.
17 A. At the time, yes.
18 Q. (By Mr. Kallinen) Okay. If he's not belted
19 in, why did you even open the back door?
20 A. So I could speak with him.
21 Q. You couldn't have spoken to him from the front
22 seat where you were?
23 A. Sure, I could have but that would have required
24 me screaming at him because he was screaming at me.
25 And, Counsel, last time I checked, no people screaming

Page 58

1  at each other has ever deescalated anything.
2  Q. So how did opening the back door stop him from
3  screaming?
4  A. It would have allowed us to have a face-to-face
5  personal conversation.
6  Q. Well, can't you just look at him from the front
7  seat and, you know, turn your head?
8  A. Not with the same effect. And no, not where I
9  was seated.
10 Q. So you believe that your physical presence
11 right next to him would cause him to quit screaming?
12 A. Not only do I believe it, it's what I've been
13 trained to do and in my experience, yes.
14 Q. Okay. Did your use of force that day comport
15 with the Galveston County Sheriff Office's policies?
16 A. I believe it did.
17 Q. Did your use of force that day comport with the
18 Galveston County Sheriff Office's training that you
19 received?
20 A. I believe it did.
21        MS. PALMER: Objection, form.
22 Q. (By Mr. Kallinen) Have you ever been an expert
23 witness in any case?
24 A. Yes.
25 Q. And which particular case was that one?

Page 59

1  A. Be a driving while intoxicated.
2  Q. Is that because you have -- what specific
3  training do you have in that area?
4  A. I'm an SFST instructor, also an SFST expert,
5  vehicle crash expert, and I'm a drug recognition expert.
6  Q. And was that a civil case or a criminal case?
7  A. Criminal.
8  Q. Was it for the prosecution or for the defense?
9  A. Prosecution.
10 Q. And how many times have you testified for the
11 prosecution as a DWI expert?
12 A. One time.
13 Q. Was there a conviction or no?
14 A. I don't recall.
15 Q. Do you recall the name of that case?
16 A. I do not.
17 Q. You recall whether it was in Galveston County
18 misdemeanor court or district court or what?
19 A. I don't recall which court.
20 Q. Was it in Galveston County?
21 A. Yes.
22 Q. What year was that?
23 A. I don't recall.
24 Q. Is there a way you could look up?
25 A. No.

Page 60

1  Q. Were you required to file a report?
2  A. With what?
3  Q. An expert report. Sometimes, you know, like in
4  federal cases you've got to file expert reports. I know
5  in state cases a lot of times you don't.
6         Did you file an expert report in regards to
7  being an expert on a DWI case?
8  A. No.
9  Q. Do you remember the prosecutor's name which
10 employed your -- or asked for your services?
11 A. No.
12 Q. Did you get -- just -- was that on your usual
13 salary with the Galveston County Sheriff's Office or did
14 you like get extra money or how did the compensation
15 work in that case?
16 A. Just my normal salary.
17 Q. Okay. But you're not an expert in excessive
18 force, are you?
19 A. I am not.
20 Q. Okay. Or use of force. Right?
21 A. I am not.
22        MR. KALLINEN: Let me just -- just for like
23 a minute, let me confer with my client. I'm going to
24 give him a phone call. I'm going to get off here.
25 We'll use one minute to confer with my client to see if

Page 61

1  I have any more questions.  Is that okay?
2          THE WITNESS:  Sure.
3          (Recess from 12:02 p.m. to 12:07 p.m.)
4  Q.  (By Mr. Kallinen) Corporal?
5  A.  Yes, sir.
6  Q.  Did you understand all of my questions today?
7  A.  Some of them, yes.
8  Q.  Were you truthful in all of the -- your
9  responses?
10  A.  Yes.
11          MR. KALLINEN:  Pass the witness.
12          MS. PALMER:  I'll reserve my questions
13  until time of trial.
14          MR. CAGLE:  I'll reserve my questions for
15  trial as well.
16          THE REPORTER:  Did --
17          MR. CAGLE:  All right.  I'll reserve my
18  questions for time of trial.
19          THE REPORTER:  Did anyone want a copy of
20  the transcript?
21          MR. KALLINEN:  Randall Kallinen does.
22          MR. CAGLE:  I would like a copy as well.
23          MS. PALMER:  I don't -- I will probably
24  order one later.
25          (Signature required.)

Page 62

1          CHANGES AND SIGNATURE
2  PAGE/LINE    CHANGE FROM/CHANGE TO       REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 63

1  I, ZACH HOLLEY, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5          _____
            ZACH HOLLEY
6
7
8
9
10 THE STATE OF TEXAS      )
11 COUNTY OF HARRIS        )
12 Before me, _____, on this day personally
13 appeared ZACH HOLLEY, known to me (or proved to me under
14 oath or through _____) (description of
15 identity card or other document) to be the person whose
16 name is subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19
20 Given under my hand and seal of office this _____ day of
21 _____, 2021.
22
23          _____
24          NOTARY PUBLIC IN AND FOR
25          THE STATE OF TEXAS

Page 64

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              GALVESTON DIVISION
3  STEPHEN PATRICK    ) Civil Action No.: 3:20-cv-374
   BRYANT III         ) (Jury Trial)
4                     )
   V.                 )
5                     )
   GALVESTON COUNTY,  )
6  TEXAS, et al.      )
7          REPORTER'S CERTIFICATION
           DEPOSITION OF ZACH HOLLEY
8             NOVEMBER 4, 2021
9
10     I, Valerie B. Szyman, a Certified Shorthand
11 Reporter in and for the State of Texas, hereby certify
12 to the following:
13     That the witness, ZACH HOLLEY, was duly sworn by
14 the officer and that the transcript of the oral
15 deposition is a true record of the testimony given by
16 the witness;
17     That the original deposition was delivered to
18 Mr. Randall L. Kallinen.
19     That a copy of this certificate was served on
20 all parties and/or the witness shown herein on
21 _____.
22     I further certify that pursuant to FRCP Rule
23 30(f)(1) that the signature of the deponent:
24     ____ was requested by the deponent or a party
25 before the completion of the deposition and that the

Page 65

1  signature is to be before any notary public and returned
2  within 30 days from date of receipt of the transcript.
3  If returned, the attached Changes and Signature Page
4  contains any changes and the reasons therefore:
5       ____ was not requested by the deponent or a
6  party before the completion of the deposition.
7       I further certify that I am neither counsel for,
8  related to, nor employed by any of the parties or
9  attorneys in the action in which this proceeding was
10 taken, and further that I am not financially or
11 otherwise interested in the outcome of the action.
12      Certified to by me this, the 22nd day of
13 November, 2021.
14
15      _____
16      Valerie B. Szyman, CSR
        Texas CSR No. 6113
17      Expiration Date:  4-30-2022
        The Legal Wizards, LLC
18      Firm Registration No. 629
        5680 Highway 6, PMB 393
19      Missouri City, Texas  77459
        (713) 484-5944 - Telephone
20      (713) 850-7388 - Fax
        depo@thelegalwizards.com
21
22
23
24
25

Page 66

1   COUNTY OF HARRIS      )
    STATE OF TEXAS        )
2
3       I hereby certify that the witness was notified
4   on _____ that the witness has 30 days or
5   (_____ days per agreement of counsel) after being
6   notified by the officer that the transcript is available
7   for review by the witness and if there are changes in
8   the form or substance to be made, then the witness shall
9   sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11      That the witness' signature was/was not
12  returned as of _____.
13      Subscribed and sworn to on this, the ____ day of
14  _____, 2021.
15
16
17      _____
18      Valerie B. Szyman, CSR
        Texas CSR No. 6113
19      Expiration Date:  4-30-2022
        The Legal Wizards, LLC
20      Firm Registration No. 629
        5680 Highway 6, PMB 393
21      Missouri City, Texas  77459
        (713) 484-5944 - Telephone
22      (713) 850-7388 - Fax
        depo@thelegalwizards.com
23
24
25